Burford-Toothaker Tractor Company v. Commissioner.
Burford-Toothaker Tractor Co. v. Commissioner
Docket No. 19406.
United States Tax Court
1950 Tax Ct. Memo LEXIS 252; 9 T.C.M. (CCH) 205; T.C.M. (RIA) 50069; March 13, 1950
Fred S. Ball, Jr., Esq., for the petitioner. Homer F. Benson, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies in income and declared value excess-profits taxes for the year 1941 in the respective amounts of $4,162.31 and $1,722.24, and excess-profits tax for the years 1941, 1942, and 1943 in the total amount of $82,326.48. The questions for our determination are: (1) Is an opinion, by this Court, as to the reasonableness of compensation of petitioner's two officers for the taxable years 1935, 1936, and 1937 res judicata of that issue for the taxable years 1941, 1942, and 1943? (2) Are the amounts paid by the petitioner to each of its two officers for the taxable years 1941, 1942, and 1943, in excess *253 of amounts allowed by the respondent as reasonable compensation for services rendered, deductible as ordinary and necessary business expense? From evidence, documentary and oral, we make the following Findings of Fact Petitioner is a corporation organized under the laws of Alabama on December 12, 1934, for the purpose of engaging in the business of selling and servicing road working and dirt moving machinery, diesel engines, and related equipment. Petitioner's office and principal place of business in Montgomery, Alabama. Its franchise to sell Caterpillar tractors and equipment included the southern half of Alabama and the northwest part of Florida. Its capital stock consisted of 1,500 shares of common stock of which 749 shares were owned by Harry H. Toothaker, one share by his wife, 749 shares by J. Lamar Burford, and one share by his wife. The stock ownership here described has remained the same since petitioner was organized. Petitioner keeps its books and records, and filed its Federal tax returns, on an accrual basis of accounting. Its Federal tax returns for the taxable years here in question were filed with the collector of internal revenue for the district of Alabama, *254 at Birmingham. From the date petitioner was organized, through the taxable years, the petitioner has had only two officials, to-wit, Harry H. Toothaker, president, and J. Lamar Burford, vice-president, secretary, and treasurer. During the taxable years, Toothaker's age was 48, 49, and 50, respectively. His education and experience consisted of a high school education, and attendance until his junior year at the University of Illinois, studying civil engineering. After a period of war service in World War I, he attended the University of Grenoble in France, which was followed by two or three years' experience as a civil engineer with the Illinois State Highway Department. He was then in the road constructing business about five years, following which he went into the construction machinery business, in which he handled accounts similar to those of the present company. He remained there three or four years. After that, for about a year, he was employed as sales and service manager of the Construction Machinery Department of the Lombard Company. While employed there he received a salary of $350 a month and his contract called for a bonus on all sales above $150,000 as follows: $150,000
to $200,000 of 1 per cent
200,000
to 250,000 of 1 1/2 per cent
250,000
to 300,000 of 2 per cent
300,000
and over of 3 per cent
*255 He and Burford then organized the Georgline Company in Augusta, Georgia, which handled the Caterpillar tractor account with other road machinery accounts, and they remained in it from 1931 to 1934 when the petitioner was organized. During the taxable years Burford's age was 38, 39, and 40, respectively. He completed high school, and worked for about ten years with the Lombard Iron Works & Supply. Co. His work with the Lombard Co. was in the machine shop, supply and accounting departments. When he left, he was cashier and in charge of the office. After leaving the Lombard Co., he and Toothaker organized the aforementioned Georgline Co. The petitioner's capitalization of 1,500 shares of common stock at $50,000 when organized had been increased to $150,000 by the end of 1940. Petitioner's earned surplus account showed the following amounts: December 31, 1940, $94,123.87; December 31, 1941, $110,675.15; December 31, 1942, $404,616.12; December 31, 1943, $350,314.67. The following schedule shows the pertinent facts concerning the sales and financial operation of the business from 1935 through 1943: Com-
Profit be-
Profit after
pensation
Sales used
fore fed. in-
fed. in-
of officers
Year
Total sales
equipment
come taxes
come taxes
(total)
1935
$ 430,773.87
$23,538.80
1936
669,988.77
$ 31,935.00
$ 23,740.52
$20,774.29
32,800.00
1937
874,660.00
54,321.58
23,994.44
20,807.33
40,986.40
1938
730,116.36
69,806.92
18,228.38
16,156.44
35,204.64
1939
1,013,260.77
77,790.59
38,563.63
32,193.64
46,530.44
1940
1,211.558.59
151,734.66
41,035.30
31,467.49
54,462.84
1941
1,846,111.05
252,041.43
82,578.29
43,935.37
79,844.44
1942
2,280,348.95
833,452.62
299,602.66
75,154.07
97,213.22
1943
1,562,840.47
271,922.93
198,943.36
56,439.91
68,492.04
*256 Other commis-
sions received
by the corpo-
ration and not
included
in sales
Divi-
on which
dends
Year
bonus paid
paid
1935
1936
$ 7,110.63
$10,000
1937
11,977.83
10,200
1938
10,258.79
6,780
1939
12,474.75
10,560
1940
6,176.70
12,000
1941
7,866.00
12,000
1942
29,254.29
12,000
1943
23,699.89
12,000
Under date of October 20, 1941, the petitioner herein was a party to a proceeding in which Memorandum Opinion was rendered by the United States Board of Tax Appeals, under the style of Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, Docket No. 100911. The findings of fact and opinion in such proceeding are incorporated in these findings of fact by this reference. The petitioner's business was managed and supervised solely by its two officers, Burford and Toothaker. They worked together as a team. They devoted all of their time to the business, working six days a week, an average of two or three nights a week, and often on Sunday. They participated in various ways in most sales. Petitioner had other salesmen in its organization, the same number in the taxable years as in 1935 and 1938. Petitioner's two *257 officers were away from their offices a substantial amount of time for various reasons, such as working on sales, collecting accounts, visits to Caterpillar factory (visits not required, purpose of visits was to keep contacts), or trips to Washington to prevail on the War Production Board to grant priorities on equipment for customers. During the years in question petitioner's officers had additional work because of the Draft Boards (in attempting to secure deferments for certain vital employees), and war regulations. The demand for machines sold by the petitioner increased in each of the taxable years, over the previous year. Supply decreased. In 1941 equipment was in free supply. Petitioner could get all the equipment it could sell and had to sell all it got. Later customers were begging for machines. People regularly came in to petitioner's office to call on the officers, when ready to buy equipment. The officers also made sales over the territory covered by petitioner. Petitioner's officers, after 1941, encountered some sales resistance. The big problem after 1941 was the acquisition of machinery (new and used) to sell. One method used to alleviate this problem was to obtain *258 new lines from other manufacturers to help fill out the scarcity of new equipment needed. During the taxable years it was difficult to obtain employees with experience to work for petitioner. During this period petitioner lost one department head who has not as yet been replaced. The following schedule indicates the amount of change in the number of employees in petitioner's organization during the taxable years: Number of
employees
Number of
at be-
New
employees
Gain
ginning
employees
at end
or
Year
of year
hired
of year
(Loss)
1941
42
28
53
11 1942
53
45
52
(1)
1943
52
45
59
7  Petitioner's two officers interviewed all new employees and supervised their training. The operation of the petitioner required borrowing from banks which was at one time during the taxable years as high as $425,000. All of these borrowings were individually guaranteed by the endorsement of Burford and Toothaker, who together had a net worth of approximately $500,000. The additional compensation, above the $9,000 for each of the two officers, for 1941 was provided by resolution of the Directorship on December 19, 1941, and was applied *259 to 1942 and 1943 by resolutions passed December 17, 1942, and December 16, 1943, respectively. Except for a slight deviation in the year 1935, the annual salaries of Burford and Toothaker, since the formation of the corporation through the year 1943, have been, for each, $9,000 plus 2 per cent on all sales in excess of $300,000. In his determination of the deficiency, the respondent allowed as a deduction for compensation to Burford and Toothaker the amount of $25,000 each for each of the years here involved, and restored the remainder to income in the respective year. The amounts paid by petitioner in 1941, 1942, and 1943 as compensation for Burford and Toothaker constitute reasonable compensation for personal services actually rendered, to the extent, respectively, for each of the two officers, as follows: For 1941 $37,500, for 1942 $40,000, and for 1943 $30,000. Opinion The first question for our determination is whether our Memorandum Opinion involving the same parties, Docket No. 100911, entered under date of October 20, 1941, and involving the taxable years 1935, 1936, and 1937, is res judicata upon the question in this proceeding. The Memorandum Opinion involving the *260 years 1935, 1936, and 1937 decided the question: "Did the Commissioner err in determining that $9,000 per annum represented reasonable compensation to each officer for personal services actually rendered by petitioner's two officers in the years 1935, 1936, and 1937?" As we read the opinion, we did not give a "blanket endorsement" to the method the petitioner used in arriving at the compensation, but there held that the entire compensation paid to each officer during the years 1935, 1936, and 1937, was reasonable. It will be noted that in that Memorandum Opinion the largest amount paid in any one year to the two officers was $40,986.40, while in the instant proceeding the Commissioner is allowing as reasonable an amount for the two officers of $50,000 a year and contending that any additional amount over that amount is unreasonable. The petitioner argues that the Memorandum Opinion recognizes the validity of the method it employed in calculating its officers' salaries, but the language of our conclusion as to the reasonableness of the compensation was as follows: "* * * we must conclude that the compensation paid by petitioner to its officers was, according to this criterion [i.e. *261 , a comparison of what would have been paid under the Lombard Co. contract heretofore referred to in our facts and what was actually paid], reasonable." Our conclusion did not rest merely upon that comparison but on other grounds as well. Nowhere in the opinion do we find any mention of a general approval of the method employed by petitioner in arriving at the compensation paid to its officers. As to tax cases, res judicata has been carefully considered in Tait v. Western Maryland Railway Co., 289 U.S. 620, and, more recently, in Commissioner v. Sunnen, 333 U.S. 591. In the instant proceeding the case involved is an action between the same parties but the question is different, involving facts of a different period, and different conditions; and only matters actually presented and determined in the first case are binding here. This is the principle of equitable estoppel rather than res judicata. As heretofore mentioned, the only way the previous case could be binding on the instant proceeding is to have approved the method of computation as to officers' salaries. Clearly, we made no such conclusion. We hold that res judicata does not here apply. The second *262 question for our determination is, whether the amounts paid by the petitioner to each of its two officers for the taxable years 1941, 1942, and 1943, in excess of the amounts allowed by the respondent as reasonable compensation for services rendered, are deductible as ordinary and necessary business expenses. The petitioner's right to the deductions here claimed must meet the requirements of Section 23(a) of the Internal Revenue Code. [1] "It is well settled that the question of what constitutes, for the tax deduction here in issue, reasonable compensation to a specific officer of a corporation, is essentially a question of fact, to be determined by the peculiar facts and circumstances in each particular case." Miller Mfg. Co. v. Commissioner, 149 Fed. (2d) 421, 422. See also Capitol-Barge Dry Cleaning Co. v. Commissioner, 131 Fed. (2d) 712. Since the question we have to decide is essentially a question of fact, we feel that nothing would be accomplished in setting forth a detailed examination of the many cases dealing with the subject matter here under consideration.
*263 The Internal Revenue Code provides that the salary or other compensation paid or incurred in carrying on any trade or business must be reasonable. The fact that we approved the salaries of these officers for former years, and that in the years here involved the method of calculating salaries was the same as that used in the former years, does not of itself, and as a matter of fact, make the compensation in the taxable years, based on that same formula, reasonable, for here we have for consideration other and different facts and conditions. These we proceed to examine. Burford and Toothaker, petitioner's only officers, personally built up its business through their diligence and ingenuity. They devoted their entire time, and long office hours, to the management of the business. That fact is important, and has been given full weight. But it is not all-important, though the facts clearly show that the success of petitioner was due primarily to the efforts of Burford and Toothaker. They worked together as a team. Their joint efforts made it possible for the petitioner to meet the additional problems that faced it during the taxable years, particularly the problem of securing equipment *264 to sell. The large profits in the taxable years were made possible to a large extent by the effort expended by Burford and Toothaker in prior and less profitable years. Nevertheless, we think from the record before us that the amount of sales, therefore the amount of the 2 per cent thereof paid to the two officers, can not be attributed altogether to such efforts by them. The evidence shows that in the taxable years after 1941 customers were begging for new machines, though "in some cases" there was sales resistance on new machines, that the demand for machines was greater in each taxable year than in the last, also that in 1941 equipment was "in free supply" - they "could get all we could sell, and had to sell all equipment we got." Though accent was placed on the sale of used equipment, and the difficulty in securing it, the record shows that in the years involved such sales were not a major matter. In 1941 about oneseventh, in 1942 a little more than one-third, and in 1943 a little more than one-sixth, of total sales. The evidence is to some extent unclear as to the part actually taken by the two officers in sales, indicating that "people come in" to call on the two officers when *265 ready to buy, but elsewhere that they were out actively selling. The company had salesmen in the taxable years, the same number as in 1935 and 1936, indicating that the necessity therefor had not been diminished by the officers' selling, though we fully realize that the officers did contribute much to the sales. Though people regularly came to the office when ready to buy, and though after 1941 people begged for machines, there was nevertheless sales resistance. The amount is not made clear by the evidence, but we recognize that it was by no means absent. However, it is clear from the record that after 1941 there was no sales problem of consequence, but that the problem was securing equipment to sell. That problem, in our view, does not so fully take the place of the sales problem as to indicate that, despite lack of ordinary sales difficulties, the officers should be compensated in the full amount based on sales. Another fact requiring consideration is the parallel between stock ownership and divisive amount of salaries paid. Aside from the two shares belonging to the two officers' wives, they owned the stock equally, and divided the officers' salaries equally. The fact of such *266 equal ownership and equal division is, of course, not determinative that the salaries were a substitute for payment of dividends, particularly in the light of the fact that the officers' duties and work was in general equal; yet it is an element requiring consideration in connection with dividends paid. The situation in that respect is significant. The petitioner stresses the fact that during the taxable years $12,000 was paid annually in dividends upon capital of $150,000. We note, however, that during 1936 $10,000 and in 1937 $10,200 was paid in dividends, so that at most dividiends increased only $2,000 over those years; yet sales and earnings had both increased, in the taxable years, in a much greater proportion. In 1936 sales were $669,988.77 and profit $20,774.29 (after Federal income taxes), while for 1937 sales were $874,660 and earnings $20,807.33, whereas for the taxable years sales were, roughly, $1,800,000 in 1941, $2,280,000 in 1942, and $1,562,000 in 1943 and profit was, respectively, about $43,000, $75,000, and $56,000 - yet only $12,000, a much smaller portion of earnings or sales, was distributed in dividends. This comparison is affected, of course, by the fact that *267 earned surplus increased from about $95,000 at the beginning of 1941 to about $350,000 at the end of 1943, and we by no means overlook the fact that such increase in surplus greatly increased the book value of the stock. Nevertheless, even a considerable increase in surplus or considerable dividend does not of itself justify high compensation to officers, though it enters into the problem. The final test is whether, under all the circumstances, such compensation is reasonable. It could be, or could fail to be, even though dividends and surplus accumulation were both large. Under the test of reasonableness, comparison of dividends in the taxable years, with those of earlier years, appears to indicate that dividends are not in the taxable years the vehicle of distribution of earnings as much proportionately as in earlier years, and therefore that salaries are being, in some degree, used for that purpose. Our conclusion from all of the evidence is that conditions in the years involved assisted materially in the matter of sales, though not to the extent contended for by the respondent. The amount of sales being different, the amount of reasonable salaries varies, for there being an arrangement *268 for a percentage based upon sales, it is given effect subject only to the test of reasonableness of amount under the circumstances - which here, in our view, indicate that, after 1941, conditions as to sales were such that the officers' efforts alone did not reflect the sales. From such evidence we conclude that reasonable deductions for compensation for each of the two officers, for personal services rendered, were as follows: For 1941 we think the evidence justifies compensation in almost the full amount claimed and approve $37,500; for 1942 $40,000, and for 1943 $30,000. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *.↩