## COMMISSIONER OF INTERNAL REVENUE v. SUNNEN.

No. 227. Argued December 17, 1947.—Decided April 5, 1948.

*Arnold Raum* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Helen R. Carloss* and *L. W. Post.*

*C. Powell Fordyce* argued the cause and filed a brief for respondent.

Opinion of the Court by Mr. Justice Murphy, announced by Mr. Justice Rutledge.

The problem of the federal income tax consequences of intra-family assignments of income is brought into focus again by this case.

The stipulated facts concern the taxable years 1937 to 1941, inclusive, and may be summarized as follows:

The respondent taxpayer was an inventor-patentee and the president of the Sunnen Products Company, a corporation engaged in the manufacture and sale of patented grinding machines and other tools. He held 89% or 1,780 out of a total of 2,000 shares of the outstanding stock of the corporation. His wife held 200 shares, the vice-president held 18 shares and two others connected with the corporation held one share each. The corporation's board of directors consisted of five members, including the taxpayer and his wife. This board was elected annually by the stockholders. A vote of three directors was required to take binding action.

The taxpayer had entered into several non-exclusive agreements whereby the corporation was licensed to manufacture and sell various devices on which he had applied

for patents.[1] In return, the corporation agreed to pay to the taxpayer a royalty equal to 10% of the gross sales price of the devices. These agreements did not require the corporation to manufacture and sell any particular number of devices; nor did they specify a minimum amount of royalties. Each party had the right to cancel the licenses, without liability, by giving the other party written notice of either six months or a year.[2] In the absence of cancellation, the agreements were to continue in force for ten years. The board of directors authorized the corporation to execute each of these contracts. No notices of cancellation were given. Two of the agreements were in effect throughout the taxable years 1937–

---

[1] The various devices involved were as follows:

(1) A cylinder grinder. The taxpayer applied for a patent on Nov. 17, 1927, and was issued one on Dec. 4, 1934. The royalty agreement to manufacture and sell this device was dated Jan. 10, 1928. This agreement expired on Jan. 10, 1938; a renewal agreement in substantially the same terms was then executed for the balance of the life of the patent, which ends on Dec. 4, 1951.

(2) A pinhole grinder. The taxpayer applied for a patent on Dec. 4, 1931, and was issued one on June 13, 1933. The royalty agreement to manufacture and sell this device was dated Dec. 5, 1931.

(3) A crankshaft grinder. The taxpayer applied for a patent on May 22, 1939, and was issued one on May 6, 1941. The royalty agreement to manufacture and sell this device was dated June 20, 1939.

(4) Another crankshaft grinder. The taxpayer applied for a patent on Dec. 29, 1939. He assigned this application to his wife on Dec. 29, 1942, and she was issued a patent on Jan. 26, 1943. The royalty agreement to manufacture and sell this device was dated June 20, 1939.

The taxpayer remained the owner of the first three patents throughout the year 1941, and he remained the owner of the patent application on the fourth device throughout that year.

[2] Six months' notice was provided in the agreement dated Jan. 10, 1928, covering the cylinder grinder. The other three agreements provided for one year's notice of cancellation.

1941, while the other two were in existence at all pertinent times after June 20, 1939.

The taxpayer at various times assigned to his wife all his right, title and interest in the various license contracts.[3] She was given exclusive title and power over the royalties accruing under these contracts. All the assignments were without consideration and were made as gifts to the wife, those occurring after 1932 being reported by the taxpayer for gift tax purposes. The corporation was notified of each assignment.

In 1937 the corporation, pursuant to this arrangement, paid the wife royalties in the amount of $4,881.35 on the license contract made in 1928; no other royalties on that contract were paid during the taxable years in question. The wife received royalties from other contracts totaling $15,518.68 in 1937, $17,318.80 in 1938, $25,243.77 in 1939, $50,492.50 in 1940, and $149,002.78 in 1941. She included all these payments in her income tax returns for those years, and the taxes she paid thereon have not been refunded.

---

[3] On Jan. 8, 1929, the taxpayer assigned to his wife "all my rights title and interest in and to the Royalty which shall accrue hereafter to me" upon the royalty contract of Jan. 10, 1928, with respect to the cylinder grinder device. Since the Commissioner of Internal Revenue raised some question as to the sufficiency and completeness of this assignment, the taxpayer executed a further assignment on Dec. 21, 1931. This second assignment confirmed the first one and stated further that his wife was assigned "all of my right, title and interest in and to said royalty contract of January 10, 1928 . . . . And I hereby state that the royalties accruing under said royalty contract have heretofore been and are hereafter the sole and exclusive property of the said Cornelia Sunnen [his wife], and hereby declare that said royalties shall be paid to the said Cornelia Sunnen or to her order, and that she shall have the sole right to collect, receive, receipt for, retain or sue for said royalties."

Assignments similar in form and substance to the assignment of Dec. 21, 1931, were made as to the other three royalty contracts.

Relying upon its own prior decision in *Estate of Dodson* v. *Commissioner*, 1 T. C. 416,[4] the Tax Court held that, with one exception, all the royalties paid to the wife from 1937 to 1941 were part of the taxable income of the taxpayer. 6 T. C. 431. The one exception concerned the royalties of $4,881.35 paid in 1937 under the 1928 agreement. In an earlier proceeding in 1935, the Board of Tax Appeals dealt with the taxpayer's income tax liability for the years 1929–1931; it concluded that he was not taxable on the royalties paid to his wife during those years under the 1928 license agreement. This prior determination by the Board caused the Tax Court to apply the principle of *res judicata* to bar a different result as to the royalties paid pursuant to the same agreement during 1937.

The Tax Court's decision was affirmed in part and reversed in part by the Eighth Circuit Court of Appeals. 161 F. 2d 171. Approval was given to the Tax Court's application of the *res judicata* doctrine to exclude from the taxpayer's income the $4,881.35 in royalties paid in 1937 under the 1928 agreement. But to the extent that the taxpayer had been held taxable on royalties paid to his wife during the taxable years of 1937–1941, the decision was reversed on the theory that such payments were not income to him. Because of that conclusion, the Circuit Court of Appeals found it unnecessary to decide

---

[4] In the *Dodson* case, Dodson owned 51% of the stock of a corporation and his wife owned the other 49%. He was the owner of a formula and trade mark. Pursuant to a contract which he made with the corporation, the corporation was given the exclusive use of the formula and trade mark for 5 years, renewable for a like period. Dodson was to receive in return a royalty measured by a certain percentage of the net sales. He then assigned a one-half interest in the contract to his wife, retaining his full interest in the formula and trade mark. The Tax Court held that his dominant stock position permitted him to cancel or modify the contract at any time, thus rendering him taxable on the income flowing from his wife's share in the contract.

the taxpayer's additional claim that the *res judicata* doctrine applied as well to the other royalties (those accruing apart from the 1928 agreement) paid in the taxable years. We then brought the case here on certiorari, the Commissioner alleging that the result below conflicts with prior decisions of this Court.

If the doctrine of *res judicata* is properly applicable so that all the royalty payments made during 1937–1941 are governed by the prior decision of the Board of Tax Appeals, the case may be disposed of without reaching the merits of the controversy. We accordingly cast our attention initially on that possibility, one that has been explored by the Tax Court and that has been fully argued by the parties before us.

It is first necessary to understand something of the recognized meaning and scope of *res judicata,* a doctrine judicial in origin. The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell* v. *County of Sac,* 94 U. S. 351, 352. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, "Res Judicata," 38 Yale L. J. 299; Restatement of the Law of Judgments, §§ 47, 48.

But where the second action between the same parties is upon a different cause or demand, the principle of

*res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *Cromwell* v. *County of Sac, supra,* 353. And see *Russell* v. *Place,* 94 U. S. 606; *Southern Pacific R. Co.* v. *United States,* 168 U. S. 1, 48; *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661, 671. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, §§ 68, 69, 70; Scott, "Collateral Estoppel by Judgment," 56 Harv. L. Rev. 1.

These same concepts are applicable in the federal income tax field. Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is *res judicata* as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Col-

lateral estoppel operates, in other words, to relieve the government and the taxpayer of "redundant litigation of the identical question of the statute's application to the taxpayer's status." *Tait* v. *Western Md. R. Co.,* 289 U. S. 620, 624.

But collateral estoppel is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability. A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. Compare *United States* v. *Stone & Downer Co.,* 274 U. S. 225, 235–236. Such consequences, however, are neither necessitated nor justified by the principle of collateral estoppel. That principle is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers.

And so where two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that

decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. *Tait* v. *Western Md. R. Co., supra.* If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation. See *Travelers Ins. Co.* v. *Commissioner,* 161 F. 2d 93. And where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive. See *State Farm Ins. Co.* v. *Duel,* 324 U. S. 154, 162; 2 Freeman on Judgments (5th ed. 1925) § 713. As demonstrated by *Blair* v. *Commissioner,* 300 U. S. 5, 9, a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable.[5] But the intervening decision need not necessarily be that of a state court, as it was in the *Blair* case. While such a state court decision may be considered as having changed the facts for federal tax litigation purposes, a modification or growth in legal principles as enunciated in intervening decisions of this Court may also effect a significant change in the situation. Tax inequality can result as readily from neglecting legal modulations by this Court as from disregarding factual changes wrought by state courts. In either event, the supervening decision cannot justly be ignored by blind reliance upon the rule of collateral estoppel. *Henricksen* v. *Seward,* 135 F. 2d 986, 988–989; *Pelham Hall Co.* v. *Hassett,* 147 F. 2d 63, 68–69; *Commissioner* v. *Arundel-Brooks Concrete Corp.,* 152 F. 2d 225, 227; *Corrigan* v. *Commissioner,* 155 F. 2d 164, 165;

---

[5] See also *Henricksen* v. *Seward,* 135 F. 2d 986; *Monteith Bros. Co.* v. *United States,* 142 F. 2d 139; *Pelham Hall Co.* v. *Hassett,* 147 F. 2d 63; *Commissioner* v. *Arundel-Brooks Concrete Corp.,* 152 F. 2d 225; *Corrigan* v. *Commissioner,* 155 F. 2d 164. Compare *Grandview Dairy* v. *Jones,* 157 F. 2d 5.

and see *West Coast Life Ins. Co.* v. *Merced Irr. Dist.*, 114 F.·2d 654, 661–662; contra: *Commissioner* v. *Western Union Tel. Co.*, 141 F. 2d 774, 778.˙ It naturally follows that an interposed alteration in the pertinent statutory provisions or Treasury regulations can make the use of that rule unwarranted. *Tait* v. *Western Md. R. Co.*, *supra*, 625.[6]

Of course, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different. See *The Evergreens* v. *Nunan*, 141 F. 2d 927. And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case.[7] Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of *stare decisis*. Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second

---

[6] And see *Commissioner* v. *Security-First Nat. Bank*, 148 F. 2d 937.

[7] *Stoddard* v. *Commissioner*, 141 F. 2d 76, 80; *Campana Corporation* v. *Harrison*, 135 F. 2d 334; *Engineer's Club of Philadelphia* v. *United States*, 42 F. Supp. 182.

proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. *Tait* v. *Western Md. R. Co., supra.* And see Griswold, "Res Judicata in Federal Tax Cases," 46 Yale L. J. 1320; Paul and Zimet, "Res Judicata in Federal Taxation," appearing in Paul, Selected Studies in Federal Taxation (2d series, 1938), p. 104.

It is readily apparent in this case that the royalty payments growing out of the license contracts which were not involved in the earlier action before the Board of Tax Appeals and which concerned different tax years are free from the effects of the collateral estoppel doctrine. That is true even though those contracts are identical in all important respects with the 1928 contract, the only one that was before the Board, and even though the issue as to those contracts is the same as that raised by the 1928 contract. For income tax purposes, what is decided as to one contract is not conclusive as to any other contract which is not then in issue, however similar or identical it may be. In this respect, the instant case thus differs vitally from *Tait* v. *Western Md. R. Co., supra,* where the two proceedings involved the same instruments and the same surrounding facts.

A more difficult problem is posed as to the $4,881.35 in royalties paid to the taxpayer's wife in 1937 under the 1928 contract. Here there is complete identity of facts, issues and parties as between the earlier Board proceeding and the instant one. The Commissioner claims, however, that legal principles developed in various intervening decisions of this Court have made plain the error of the Board's conclusion in the earlier proceeding, thus creating a situation like that involved in *Blair* v. *Commissioner, supra.* This change in the legal picture is said to have been brought about by such cases as *Helvering* v.

*Clifford*, 309 U. S. 331; *Helvering* v. *Horst*, 311 U. S. 112; *Helvering* v. *Eubank*, 311 U. S. 122; *Harrison* v. *Schaffner*, 312 U. S. 579; *Commissioner* v. *Tower*, 327 U. S. 280; and *Lusthaus* v. *Commissioner*, 327 U. S. 293. These cases all imposed income tax liability on transferors who had assigned or transferred various forms of income to others within their family groups, although none specifically related to the assignment of patent license contracts between members of the same family. It must therefore be determined whether this *Clifford-Horst* line of cases represents an intervening legal development which is pertinent to the problem raised by the assignment of the 1928 agreement and which makes manifest the error of the result reached in 1935 by the Board. If that is the situation, the doctrine of collateral estoppel becomes inapplicable. A different result is then permissible as to the royalties paid in 1937 under the agreement in question. But to determine whether the *Clifford-Horst* series of cases has such an effect on the instant proceeding necessarily requires inquiry into the merits of the controversy growing out of the various contract assignments from the taxpayer to his wife. To that controversy we now turn.[8]

Had the taxpayer retained the various license contracts and assigned to his wife the right to receive the royalty

---

[8] The pertinent statutory provisions are of little help to the matter in issue. Section 22 (a) of the Revenue Act of 1936, 49 Stat. 1648, and § 22 (a) of the Revenue Act of 1938, 52 Stat. 447, cover the taxable years in question. Those sections, which are identical with the current § 22 (a) of the Internal Revenue Code, define "gross income" to include "gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the trans-

payments accruing thereunder, such payments would clearly have been taxable income to him. It has long been established that the mere assignment of the right to receive income is not enough to insulate the assignor from income tax liability. *Lucas* v. *Earl,* 281 U. S. 111; *Burnet* v. *Leininger,* 285 U. S. 136. As long as the assignor actually earns the income or is otherwise the source of the right to receive and enjoy the income, he remains taxable. The problem here is whether any different result follows because the taxpayer assigned the underlying contracts to his wife in addition to giving her the right to receive the royalty payments.

It is the taxpayer's contention that the license contracts rather than the patents and the patent applications were the ultimate source of the royalty payments and constituted income-producing property, the assignment of which freed the taxpayer from further income tax liability. We deem it unnecessary, however, to meet that contention in this case. It is not enough to trace income to the property which is its true source, a matter which may become more metaphysical than legal. Nor is the tax problem with which we are concerned necessarily answered by the fact that such property, if it can be properly identified, has been assigned. The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes. As was said in *Corliss* v. *Bowers,* 281 U. S. 376, 378, "taxation is not so much

---

action of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." See also Art. 22 (a)–1 of Treasury Regulations 94, promulgated under the 1936 Act; Art. 22 (a)–1 of Treasury Regulations 101, promulgated under the 1938 Act; and § 19.22 (a)–1 of Treasury Regulations 103, promulgated under the Internal Revenue Code.

concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."

It is in the realm of intra-family assignments and transfers that the *Clifford-Horst* line of cases has peculiar applicability. While specifically relating to short-term family trusts, the *Clifford* case makes clear that where the parties to a transfer are members of the same family group, special scrutiny is necessary "lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as § 22 (a) is concerned." 309 U. S. at 335. That decision points out various kinds of documented and direct benefits which, if retained by the transferor of property, may cause him to remain taxable on the income therefrom. And it also recognizes that the fact that the parties are intimately related, causing the income to remain within the family group, may make the transfer give rise to informal and indirect benefits to the transferor so as to make it even more clear that it is just to tax him. Even more directly pertinent, however, is the *Horst* case, together with the accompanying *Eubank* case. See 2 Mertens, Law of Federal Income Taxation (1942), §§ 18.02, 18.14. It was there held that the control of the receipt of income, which causes an assignor of property to remain taxable, is not limited to situations where the assignee's realization of income depends upon the future rendition of services by the assignor. See *Lucas* v. *Earl, supra; Burnet* v. *Leininger, supra.* Such may also be the case where the assignor controls the receipt of income through acts or services preceding the transfer. Or it may be evidenced by the possibility of some subsequent act by the assignor, or some failure to act, causing the income or property to revert to him. Moreover, the *Horst* case recognizes that the assignor may realize income

if he controls the disposition of that which he could have received himself and diverts payment from himself to the assignee as a means of procuring the satisfaction of his wants, the receipt of income by the assignee merely being the fruition of the assignor's economic gain.

In *Harrison* v. *Schaffner, supra,* 582, it was again emphasized that "one vested with the right to receive income did not escape the tax by any kind of anticipatory arrangement, however skillfully devised, by which he procures payment of it to another, since, by the exercise of his power to command the income, he enjoys the benefit of the income on which the tax is laid." And it was also noted that "Even though the gift of income be in form accomplished by the temporary disposition of the donor's property which produces the income, the donor retaining every other substantial interest in it, we have not allowed the form to obscure the reality." 312 U. S. at 583. *Commissioner* v. *Tower, supra,* and its companion case, *Lusthaus* v. *Commissioner, supra,* reiterated the various principles laid down in the earlier decisions and applied them to income arising from family partnerships.

The principles which have thus been recognized and developed by the *Clifford* and *Horst* cases, and those following them, are directly applicable to the transfer of patent license contracts between members of the same family. They are guideposts for those who seek to determine in a particular instance whether such an assignor retains sufficient control over the assigned contracts or over the receipt of income by the assignee to make it fair to impose income tax liability on him.

Moreover, the clarification and growth of these principles through the *Clifford-Horst* line of cases constitute, in our opinion, a sufficient change in the legal climate to render inapplicable, in the instant proceeding, the doctrine of collateral estoppel relative to the assignment of

the 1928 contract. True, these cases did not originate the concept that an assignor is taxable if he retains control over the assigned property or power to defeat the receipt of income by the assignee. But they gave much added emphasis and substance to that concept, making it more suited to meet the "attenuated subtleties" created by taxpayers. So substantial was the amplification of this concept as to justify a reconsideration of earlier Tax Court decisions reached without the benefit of the expanded notions, decisions which are now sought to be perpetuated regardless of their present correctness. Thus in the earlier litigation in 1935, the Board of Tax Appeals was unable to bring to bear on the assignment of the 1928 contract the full breadth of the ideas enunciated in the *Clifford-Horst* series of cases. And, as we shall see, a proper application of the principles as there developed might well have produced a different result, such as was reached by the Tax Court in this case in regard to the assignments of the other contracts. Under those circumstances collateral estoppel should not have been used by the Tax Court in the instant proceeding to perpetuate the 1935 viewpoint of the assignment.

The initial determination of whether the assignment of the various contracts rendered the taxpayer immune from income tax liability was one to be made by the Tax Court. That is the agency designated by law to find and examine the facts and to draw conclusions as to whether a particular assignment left the assignor with substantial control over the assigned property or the income which accrues to the assignee. And it is well established that its decision is to be respected on appeal if firmly grounded in the evidence and if consistent with the law. *Commissioner* v. *Scottish American Co.,* 323 U. S. 119; *Dobson* v. *Commissioner,* 320 U. S. 489. That is the standard, therefore, for measuring the propriety of

the Tax Court's decision on the merits of the controversy in this case.

The facts relative to the assignments of the contracts are undisputed. As to the legal foundation of the Tax Court's judgment on the tax consequences of the assignments, we are unable to say that its inferences and conclusions from those facts are unreasonable in the light of the pertinent statutory or administrative provisions or that they are inconsistent with any of the principles enunciated in the *Clifford-Horst* line of cases. Indeed, due regard for those principles leads one inescapably to the Tax Court's result. The taxpayer's purported assignment to his wife of the various license contracts may properly be said to have left him with something more than a memory. He retained very substantial interests in the contracts themselves, as well as power to control the payment of royalties to his wife, thereby satisfying the various criteria of taxability set forth in the *Clifford-Horst* group of cases. That fact is demonstrated by the following considerations:

(1) As president, director and owner of 89% of the stock of the corporation, the taxpayer remained in a position to exercise extensive control over the license contracts after assigning them to his wife. The contracts all provided that either party might cancel without liability upon giving the required notice. This gave the taxpayer, in his dominant position in the corporation, power to procure the cancellation of the contracts in their entirety. That power was nonetheless substantial because the taxpayer had but one of the three directors' votes necessary to sanction such action by the corporation. Should a majority of the directors prove unamenable to his desires, the frustration would last no longer than the date of the next annual election of directors by the stockholders, an election which the taxpayer could control by

reason of his extensive stock holdings. The wife, as assignee and as a party to contracts expressly terminable by the corporation without liability, could not prevent cancellation provided that the necessary notice was given.

And it is not necessary to assume that such cancellation would amount to a fraud on the corporation, a fraud which could be enjoined or otherwise prevented. Cancellation conceivably could occur because the taxpayer and his corporation were ready to make new license contracts on terms more favorable to the corporation, in which case no fraud would necessarily be present. All that we are concerned with here is the power to procure cancellation, not with the possibility that such power might be abused. And once it is evident that such power exists, the conclusion is unavoidable that the taxpayer retained a substantial interest in the license contracts which he assigned.

(2) The taxpayer's controlling position in the corporation also permitted him to regulate the amount of royalties payable to his wife. The contracts specified no minimum royalties and did not bind the corporation to manufacture and sell any particular number of devices. Hence, by controlling the production and sales policies of the corporation, the taxpayer was able to increase or lower the royalties; or he could stop those royalties completely by eliminating the manufacture of the devices covered by the royalties without cancelling the contracts.

(3) The taxpayer remained the owner of the patents and the patent applications. Since the licenses which he gave the corporation were non-exclusive in nature, there was nothing to prevent him from licensing other firms to exploit his patents, thereby diverting some or all of the royalties from his wife.

(4) There is absent any indication that the transfer of the contracts effected any substantial change in the tax-

payer's economic status. Despite the assignments, the license contracts and the royalty payments accruing thereunder remained within the taxpayer's intimate family group. He was able to enjoy, at least indirectly, the benefits received by his wife. And when that fact is added to the legal controls which he retained over the contracts and the royalties, it can fairly be said that the taxpayer retained the substance of all the rights which he had prior to the assignments. See *Helvering* v. *Clifford, supra,* 335–336.

These factors make reasonable the Tax Court's conclusion that the assignments of the license contracts merely involved a transfer of the right to receive income rather than a complete disposition of all the taxpayer's interest in the contracts and the royalties. The existence of the taxpayer's power to terminate those contracts and to regulate the amount of the royalties rendered ineffective for tax purposes his attempt to dispose of the contracts and royalties. The transactions were simply a reallocation of income within the family group, a reallocation which did not shift the incidence of income tax liability.

The judgment below must therefore be reversed and the case remanded for such further proceedings as may be necessary in light of this opinion.

*Reversed.*

Mr. Justice Frankfurter and Mr. Justice Jackson believe the judgment of the Tax Court is based on substantial evidence and is consistent with the law, and would affirm that judgment for reasons stated in *Dobson* v. *Commissioner,* 320 U. S. 489, and *Commissioner* v. *Scottish American Co.,* 323 U. S. 119.