38 C.C.P.A. (Patents)
## UNITED STATES v. BOONE.
### No. 4661.

United States Court of Customs
and Patent Appeals.
Feb. 6, 1951.

David N. Edelstein, Asst. Atty. Gen. (Richard F. Weeks and Joseph F. Donohue, Sp. Attys., New York City, of counsel), for the United States.

Lawrence, Tuttle & Harper, San Francisco, Cal. (Frank L. Lawrence and George R. Tuttle, San Francisco, Cal., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

JACKSON, Judge.

The United States has appealed from a judgment of the United States Customs Court, Third Division, one judge dissenting, sustaining two protests by appellee in which it was claimed that certain imported merchandise invoiced as barley bran was properly dutiable pursuant to the provisions of paragraph 731 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, as screenings. The paragraph, as amended by the Second Trade Agreement with Canada, 53 Stat. 2386, T.D. 49752, reduced the duty on screenings of grain to the rate of 5 per centum ad valorem.

Other claims were made in the protests but were not relied upon in the trial court and are not before us.

The Collector of Customs, at the port of San Diego, assessed the imported merchandise as a non-enumerated manufactured article at the rate of 20 per centum ad valorem in accordance with paragraph 1558.

The involved statutes read as follows:

"Par. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem."

Par. 731, as amended by T.D. 49752.

"Screenings, scalpings, chaff, or scourings of wheat, flaxseed, or other grains or seeds:
Unground, or ground........5% ad. val."

The suit was tried in San Diego, California, and two witnesses appeared on behalf of appellee. The government rested at the end of plaintiff's case.

One of the witnesses for appellee, who was the broker, merely identified the entries and stated the name of the firm which

produced the imported merchandise. The second witness was the superintendent of the plant where the barley malt was made.

It appears from the testimony that barley was purchased consisting of "light barley, broken barley, perhaps wheat; perhaps oats, and perhaps corn" all depending upon where the barley was grown. It is first cleaned in a machine by separating the whole barley grains from the broken barley, corn, oats, or other material that may be with the grain. In the cleaning machine, the material, except the whole barley grains, drops through holes in a screen. The cleaned grain is then stored in a bin. In the making of malt, as much of the barley as is to be used is weighed and dumped into what is called a "steep tank." The tank is then filled with water in which the barley is kept for a period of from 38 to 58 hours, depending upon the hardness of the grain. In the steeping, the grain acquires 50% of moisture. After it has been so moistened, the grain is placed in a germinating drum where roots or sprouts grow from the end of the grain. The period of germination was stated to be about 6 days and terminates when the sprouts are from ½ to ⅝ inches long. It appears that by germination the starch of the barley is converted into sugar. After having been germinated, the article is placed in a drying kiln in which there is a temperature of not more than 120° for the first 24 hours. Whether that temperature is centigrade or Fahrenheit the record does not show. After the initial drying, the article is transferred to another kiln in which there is a temperature of 160° for the first 20 hours and 175° for the last 4 hours. At the end of the drying process the grain is said to contain about 3.5% of moisture. After the drying process has been completed the product enters a machine in which the sprouts are removed and the final product, without the sprouts, is commercial malt.

The sprouts are then mixed with the product of the screening in the ratio of about 2 parts of screenings to 1 part of sprouts. The mixture is then put through a "hammer mill" wherein it is beaten through a small perforation and emerges as a fine mixture which is the involved merchandise.

In sustaining the protests, the opinion of the majority, Abstract 54528, seemingly relied strongly on the case of Ralph Boone v. United States, 19 Cust.Ct. 62, C.D. 1068. The plaintiff in that case is the appellee here. The importation was invoiced as barley bran. It was given the same classification by the Collector at San Diego, as was the merchandise involved herein and it was claimed there, as here, to be properly dutiable as screenings.

It appears from the decision in that case that the quantity of sprouts used in making the imported merchandise was between 3 and 5 per centum, and sometimes less than 3 per centum, by weight of the mixture. It appeared without contradiction that in commercial transactions a quantity of 15 to 20 per centum by bulk of sprouts had never been heard of in the making of barley bran.

The Third Division of the United States Customs Court sustained the protest of plaintiff in that case, but in the course of its opinion stated if conclusive evidence showed that the sprouts had been deliberately mixed with barley screenings, the position of the government might have been tenable, but that no such evidence appeared in the record. It was further stated by the court that the contention of counsel for the government that the sprouts constituted 15 per centum of the bulk of the merchandise without any "corroborative evidence" was not sufficient to overcome the uncontradicted evidence of the two witnesses appearing for plaintiff that the sprouts in the imported merchandise ranged from only 2 to 5 per centum by weight.

The conclusion of the trial court that the imported merchandise was merely screenings would seem to be based upon the fact that the imported merchandise was not made by deliberately mixing stated proportions of sprouts with stated proportions of screenings.

Obviously, the commodity before us here is not the same as that which was before the Customs Court in the Boone case, supra. Here, it clearly appears that the

sprouts were deliberately mixed with the screenings from the barley in the proportion of one part of sprouts to two parts of screenings. Therefore, while the imported merchandise in the Boone case, supra, and the instant case are similar for the reason that in each case the involved merchandise was a mixture of screenings and sprouts, there is no further similarity between the goods.

The judgment of the trial court in the Boone case, supra, was not appealed. The case was decided October 29, 1947.

In the course of its decision in that case, the trial court noted that the involved merchandise was prepared in the same manner as the barley bran in controversy in the case of Ricks v. United States, 33 C.C.P.A., Customs, 1. The Ricks case, supra, was decided by us on May 24, 1945. Why our decision in that case was not discussed in the decision of the Boone case, supra, we are unable to determine from the decision. The appellant there was the same broker who testified for appellee in the instant case. The imported merchandise in that case was classified as was the merchandise herein, and was claimed to be properly dutiable as "by-product feeds obtained in milling wheat or other cereals," pursuant to paragraph 730 of the Tariff Act of 1930, as modified by the Trade Agreement with Canada, T. D. 49752. It does not appear from our decision in the Ricks case, supra, what percentages of sprouts and screenings were mixed. In the present case a predetermined quantity of screenings was deliberately mixed with a predetermined quantity of sprouts, unquestionably to produce a predetermined result for a predetermined purpose. The final ground mixture cannot be properly termed screenings nor sprouts. It is a different material than either of its constituents.

In the Ricks case, supra, the Third Division of the United States Customs Court overruled the protest of appellant and on appeal its judgment was affirmed by us. In the course of our decision in that case, we held the imported merchandise to be a manufactured by-product, as had been held by the trial court. While the issue there

was as between by-product feeds obtained in the milling of wheat or other cereals and a non-enumerated manufactured article not specially provided for, and here, the issue is between screenings and a non-enumerated manufactured article not specially provided for, nevertheless, as far as the imported merchandise in that case is concerned, we held it to be a manufactured by-product. We can see no reason why there should be a different holding in the present appeal with respect to the character of the involved merchandise.

We do not deem it necessary to set out the dictionary definitions, nor the cases wherein screenings have been defined. The common meaning of the term is generally and well known.

We are in accord with the reasoning appearing in the dissenting opinion of the trial court herein. We agree, as was said in that opinion, that the malt sprouts are not screenings in the generally accepted sense. They cannot reasonably be so denominated. They are not part of the grain before it has been germinated and are certainly a product which is obtained in the manufacturing of malt. The dissenting opinion properly pointed out that merely because the sprouts were cleaned from the malt does not make them screenings.

In passing, it may be observed that malt sprouts are a distinct commodity and appear as such in paragraph 730 of the Tariff Act.

It has been suggested that the doctrine of res judicata applies to the instant case. It was not invoked in the trial court and has not been invoked here.

There is nothing in the record or briefs before the trial court or here to warrant injecting the applicability of that doctrine. It is generally known by all familiar with customs litigation that the doctrine does not apply in cases involving classifications of imported merchandise. It has never been applied by this or any other court and we cannot see how it ever will be. That it should not be applied and the cogent reasons why it has no place in such customs litigation is set forth at length in

the opinion of the late Chief Justice Taft in the case of United States v. Stone & Downer Company, 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013. What was set out there is still the law.

■ It is to be observed that even if the doctrine of res judicata were applicable in cases such as this it could not apply here for the reason hereinbefore stated that the involved imported merchandise is not the same as that involved in the preceding Boone case, supra.

For the reasons herein stated, the judgment of the United States Customs Court is reversed.

O'CONNELL, Judge (dissenting).

No less than six different proceedings, off and on, have staged a series of repeated contests between the parties regarding the dutiable status of the same merchandise, imported from the same foreign market, and assessed at the same rate of duty by the Collector of Customs at the port of San Diego as a nonenumerated manufactured article, at 20 per centum ad valorem, under paragraph 1558 of the Tariff Act of 1930.

The same firm of lawyers has represented the claimant under the protests in all six proceedings and, in the last three proceedings, the parties to the actions have been identical. The facts in each of the cases are otherwise substantially the same; the only difference therein relating to the quantity of the goods entered at various times.

Mary G. Ricks, customs broker for importer-appellee in the entry of the instant merchandise, was claimant under the protest in each of the first three proceedings;[1] and Ralph Boone, importer-appellee here, was claimant under the protest in the last three proceedings.[2]

The ultimate question on which the case turned in each of these contests was whether the evidence submitted by the importer in support of the claims of the protest was sufficient not only to overcome the presumption of correctness attaching to the action of the collector, but also to affirmatively establish the correctness of the claimant's contention with respect to the provision of the tariff act under which the merchandise was alleged to be properly dutiable.

The Customs Court in the first case, C. D. 535, overruled the protest of Ricks claiming that the merchandise was dutiable, either directly or by similitude, at the lower rate of 5 per centum ad valorem as by-product feeds obtained in milling wheat or other cereals, to wit, barley, under paragraph 730, as amended by the Canadian Trade Agreement, T.D. 49752.

No appeal was taken from the judgment overruling those claims but the duel between the parties was later renewed in the Customs Court in the second case hereinbefore described, C.D. 809. There counsel stipulated that the record in C.D. 535 be incorporated and made a part of the record in the second case, and that the protest in the second case be submitted for decision on the incorporated record.

By way of amendment of the protest at the trial in the second case, it was additionally claimed that the merchandise was properly dutiable under paragraph 1555, as amended by the trade agreements with Canada and the United Kingdom, at 7½ per centum ad valorem, as waste, not specially provided for.

The Customs Court again overruled the alternate claims that the merchandise was dutiable under paragraph 730, either directly or by similitude, as a by-product feed obtained in milling wheat or other cereal; or that it was dutiable at 7½ per centum ad valorem, as "Waste, not specially provided for," under paragraph 1555, as amended. On appeal from that judgment, the judgment of the court below was here affirmed.

The majority have here held that the judgment of the Customs Court in the in-

---

1. Ricks v. United States, C.D. 535; Ricks v. United States, C.D. 809; Ricks v. United States, 33 C.C.P.A.,Customs, 1.

2. Ralph Boone v. United States, 19 Cust. Ct. 62, C.D. 1068; Ralph Boone v. United States, Abstract 54528; United States v. Ralph Boone (the instant case).

stant case, Abstract 54528, was erroneous not only because the lower court applied the wrong provision of the tariff act in the assessment of the merchandise, but also because the court in reaching its conclusion there "seemingly relied strongly" on the first Boone case, 19 Cust.Ct. 62, C. D. 1068. The majority has further held that the facts in the instant case are governed by the ruling applied in the first appeal to this court.[1] That issue was not raised in the court below and there are no assignment of errors here by which the court, other than of its own motion, may decide the matter.

The question of law distinctly put in issue and directly determined in the first series of proceedings, which culminated in the former appeal to this court, is wholly different from the question precipitated in the second series of cases, which have culminated in the present appeal.

Under customs practice, the prevailing procedure to recover duties erroneously demanded and paid under protest requires the importer to pay the duty and then test its validity by suit in the Customs Court. There is no such procedural device in customs practice as a declaratory judgment designed to expedite and simplify the ascertainment of uncertain rights or duties under the provisions of the tariff act. 28 U. S.C. § 2201.

In fact, a judgment of our court recently approved the finding of a dissenting judge in the court below, that a claimant who had made an importation of merchandise merely for the purpose of obtaining a ruling as to the dutiable status of such goods was subject to a penalty of additional duty, plus the deportation of the goods, as a result of the manner in which he proceeded to obtain the desired result.[3]

The judgment of the court in a customs case is binding upon the parties with respect to the question or fact distinctly put in issue and directly determined by the court. Because of public interest, the judgment is not binding upon the parties as to any question or fact which might have been, but was not, distinctly put in issue and directly determined by the court. Res judicata in that sense has no application in customs law.

Our court on the previous appeal did not in any way entertain jurisdiction of the subject matter in the sense of a declaratory judgment. The court's decision seems to have contained, however, a possible hint, purposely or inadvertently injected, that the imported goods under the tariff act might be properly dutiable as "screenings." In any event, Boone, the importer-appellee, followed such a cue with eminent success in the tribunals of the Customs Court.

It is my position here, among other things, that the judgment of the Customs Court in the first Boone case, 19 Cust.Ct. 62, C.D. 1068, was right, but, since it was not set aside on appeal or otherwise, that judgment was effective as an estoppel on the points decided there, whether the judgment was right or wrong. Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054.

The record discloses that this appeal was taken by the United States from a judgment of the United States Customs Court, Third Division, rendered in conformity with its decision, Abstract 54528, sustaining two protests filed by appellee against the classification in the assessment of duty by the Collector of Customs at the port of San Diego of certain merchandise invoiced and entered as barley bran at the subport of Tecate, California.

Duty was assessed at the rate of 20 per centum ad valorem pursuant to the provisions of paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article, not specially provided for. Various claims in the protests were not pressed in the court below. They were amended and the protests consolidated for trial. The issue advanced there by the importer was that the merchandise was properly dutiable at the rate of 5 per centum ad valorem under paragraph 731 of the same act as amended by the trade agreement with Canada, T.D. 49752.

The pertinent provisions of the tariff act and the amendment in question read:

---

3. The United States v. D. Lisner & Co., Inc., 38 C.C.P.A.,Customs, 79, decision rendered January 16, 1951.

"Par. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem."

Par. 731, as amended by T.D. 49752:

"Screenings, scalpings, chaff, or scourings of wheat, flaxseed, or other grains, or seeds: Unground, or ground....5% ad val."

The imported merchandise is known in the trade as barley bran. It consists of two kinds of screenings mingled and ground together following their production in two successive operations by a separating machine in the cleaning of barley to be converted into malt at the plant of the exporter, Compania Mexicana de Malta, Tecate, Mexico.

The method here described of producing barley bran discloses that the barley which comes from the field is taken from the storage bin and placed in a hopper above the cleaning machine and comes into the cleaning machine, which has perforations in the top level, by the force of gravity, and is there shaken and cleaned. The screenings thus produced in the first operation comprises the wheat, broken barley, corn, or oats which went down through the holes in the cleaning machine when the barley remained on top.

The record further discloses that the cleaned barley which had remained at the top of the cleaning machine later goes into bins and is kept there until used. Then, after being weighed, it is put into steep tanks, where it remains in water from 38 to 58 hours. With respect to the completion of the method by which the barley bran is produced, the witness James H. Lorimer, superintendent of the exporter's plant, continued to testify as expressed in the following excerpt from the record:

"Q. Then what happens? A. We generally get 50 percent moisture. Then it goes to the germinating drums. That is where the growth starts.

"Q. Can you picture that growth to the court? A. The roots grow to the end just the same as you grow them in the garden.

"Q. About how large? A. Maybe a half inch long. Some get a little longer; maybe five-eighths.

"Q. Does it take a period of time before that growth starts? A. Six days germination. That is where the starch and barley is converted into sugar.

"Q. After those six days, what do you do? A. It goes to the kilns where it starts in the drying process. The temperature for the first 24 hours would be 120 degrees, no higher. Then it is dropped into another kiln, and in this one the temperature of that for the first 20 hours is 160, and the last 4 hours is 175 degrees.

"Q. That drys it out? A. Yes. By that time there is about 3.5 moisture.

"Q. What do you do after that? A. We take it away and clean the malt sprouts out of it.

"Q. How do you clean the malt sprouts out? A. The machine, with shakers.

"Q. Then you have left—? A. The malt. Then the malt after that is taken and put into the bins.

"Q. What you are calling now malt is what you were talking about before as barley? A. Yes, and it is put away until such time as the brewery, or whoever uses it, calls for it.

"Q. What do you do with the residue from the first screening and the residue or the malt sprouts that come from the second screening? A. The malt sprouts are kept in two different places, and we make the bran. We take two sacks of barley, including all those I told you, which would weigh close to 300 pounds, and one sack of malt sprouts, which would weigh about 60 to 75 pounds, and it is 2 to 1, mix them all together and put them into the hammer mill.

"Q. What happens there? A. That is where it goes through the milling.

"Q. How is it milled? A. A bunch of hammers that beats it through a perforated place.

"Q. Is that broken mixture the barley bran? A. Yes. It goes round and round and knocks it through there.

"Q. Makes it rather fine when it is all finished? A. Yes."

The product hereinbefore described, the process of making it, and its dutiable status formed the subject matter of the decision of the United States Customs Court in Ralph Boone v. United States, 19 Cust.Ct. 62, C.D. 1068. There, on October 29, 1947, the court held that barley bran, consisting of the screenings from barley mixed and ground together with the screenings and scourings from barley malt, such as we have here, was properly dutiable under the provisions of paragraph 731 of the Tariff Act of 1930, as amended by the Canadian Trade Agreement, T.D. 49752, at the rate of 5 per centum ad valorem as "Screenings, scalpings, chaff, or scourings of * * * grains or seeds * * * ground," rather than as a nonenumerated article under paragraph 1558 as classified and assessed with duty by the collector at the port of San Diego.

That suit was between the same parties who are the parties to the suit in the case at bar, and the identical question or fact distinctly put in issue as a ground of recovery and directly determined by the court in the first suit is disputed here again by the Government.

It is noteworthy that the special attorney who represented the Government in the second trial of the case asked no questions in that proceeding, cross-examined neither of appellee's witnesses, and offered no new or additional evidence on the point in issue. Counsel for appellee in submitting the instant case for decision stated:

"Mr. Tuttle: I would like to cite to the court Ralph Boone v. United States, 109141–K, decision of October 29, 1947. The purpose of the citation is that I think the court will find that the decision in that case is on the same merchandise and processed the same.

"We don't ask time for briefs."

The decisions in both the first and second suits were written by Judge Johnson and in both of them the appellee's protests were sustained.

The brief submitted here on behalf of the Government, among other things, rec-ognizes that the merchandise in issue "appears to be similar in all material respects" to the merchandise in the case of Ralph Boone v. United States, supra, and that the merchandise in this case as in that case is likewise used as feed for cattle.

The Government takes the position that the decision in the first case was not correct, was never appealed, and "In any event, it is not authority which can affect the outcome of the instant appeal." The Government contends:

"The Boone case, supra, was decided by the Customs Court under the Act of 1930. It reached the same result as the case at bar. During the course of the opinion the following sentence will be found on page 65: 'Moreover, if the evidence before the court were conclusive that the sprouts per se were deliberately mixed with the barley screenings, then in such case the Government's position might be tenable. * * *'"

"This is the basis of a possible distinction between the Boone case and the instant controversy. Here the evidence shows that the sprouts have been deliberately mixed with the barley screenings. As we read the statement of facts given in the opinion of the Boone case, it would seem that there too the sprouts had been deliberately mixed with the screenings, but the court did not so regard the operation purifying the malt in that case and on that basis the case was decided. It was never appealed. In any event, it is not authority which can affect the outcome of the instant appeal because the Government takes the position that the decision was not correct."

It is noted that barley bran and malt sprouts are distinct commodities, that malt sprouts are sometimes sold separately, and that they are specifically provided for in paragraph 730 of the Tariff Act of 1930. However, as the court below in the instant case held upon a proper citation of authority, the entry here in issue is not an importation of malt sprouts, but an importation of barley bran, consisting of screenings and nothing else; that the merchandise is used as feed for cattle or poultry, and that Congress in the enactment of the tariff provision in issue evinced an inten-

tion of providing a low rate of duty on the imported product without attempting thereby "to draw such a fine distinction as Government counsel is attempting to do in this case."

The original excerpt from the court's opinion in the first case hereinabove recited in the Government's brief was, at most, an incidental expression in the opinion concerning a hypothetical situation which did not exist in the first case and which cannot be relied upon as a ground of reversal in the case at bar. Pacific Steamship Company v. Peterson, 278 U.S. 130, 136, 49 S.Ct. 75, 73 L.Ed. 220; Pennzoil Co. v. Hercules Powder Company, 95 F.2d 339, 25 C.C.P.A., Patents, 968, 973.

The judgment of the United States Customs Court in the first Boone case hereinbefore described admittedly remains unmodified. Therefore, the case at bar, which merely involves a separate quantity of the same merchandise, falls squarely within the rule of res judicata as stated and applied in Southern Pacific Railroad Company v. United States, 168 U.S. 1, 48, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355: "The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. * * *"

The question here in issue was therefore "laid at rest by a principle which seeks to bring litigation to an end and promote certainty in legal relations," as Mr. Justice Douglas expressed it in United States v. Munsingwear, Inc., 340 U.S. 36, 39–41, 71 S.Ct. 104, 106. There, as here, counsel for the United States slept on its rights by failure to appeal or move to vacate a previous judgment of a court of competent jurisdiction.

The Supreme Court has broad supervisory powers over the judgments of the lower federal courts and in no uncertain terms has indicated that the procedure of those courts shall embrace the broad social principle of res judicata. United States v. Munsingwear, supra; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 719, 92 L.Ed. 898.

The Supreme Court in the case last cited directed the Tax Court to confine the use of the principle of res judicata in the field of income tax to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. "But," explained the court, "matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, §§ 68, 69, 70; Scott, 'Collateral Estoppel by Judgment,' 56 Harv.L.Rev. 1."

Previously the Supreme Court had denied the right of an importer to invoke the doctrine of res judicata before the United States Customs Court or the United States Court of Customs Appeals [now the United States Court of Customs and Patent Appeals] in any case where the importer had a clear right to relief against the Government on the ground of res judicata. United States v. Stone & Downer Company, 1927, 274 U.S. 225, 235, 236, 47 S. Ct. 616, 71 L.Ed. 1013. The principle of res judicata was made applicable, however, to the administration of the tariff act by the decision of the Supreme Court in Commissioner of I. R. v. Sunnen, supra, wherein the court summarized certain conditions relative to income taxes, which by comparison likewise appear to apply to customs duties. There the court stated: "As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile

basis for litigious confusion. Compare United States v. Stone & Downer Co., 274 U.S. 225, 235, 236, 47 S.Ct. 616, 71 L.Ed. 1013. Such consequences, however, are neither necessitated nor justified by the principle of collateral estoppel. * * *"

The decision in United States v. Stone & Downer Company, supra, was rendered in connection with the provisions of the tariff act of 1913 and in support of a rule of practice established by the Court of Customs Appeals during the years succeeding its creation, when the jurisdiction of that court over customs cases was exclusive and final.

Conditions since that time have changed materially with respect to customs matters. Even so, the court in United States v. Stone & Downer Company suggested that there should be an end of litigation in customs matters as well as in other tax cases; and that where no additional or material testimony was introduced on behalf of the Government in the second suit, it was within the discretion of the United States Customs Court under its rules to apply the principle of res judicata.

The instant case alone is sufficient to demonstrate that in certain situations, as here, it becomes necessary to apply that principle not only to preclude the possible disregard of the court's judgment as moot or ineffective but also to relieve the importer, the Government, and the court from the burden of redundant and expensive litigation. That conclusion is in complete harmony with the recent decision of this court which held that the United States Customs Court is a court of competent jurisdiction and the same rules of evidence apply there as in courts of general jurisdiction. W. T. Grant Company v. United States, 38 C.C.P.A., Customs, C.A.D. 440.

For the reasons hereinbefore stated, the judgment of the United States Customs Court should be affirmed.