### GENERAL MOTORS CORPORATION, FRIGIDAIRE DIVISION

v.

### UNITED STATES.

No. 55–56.

United States Court of Claims.

July 16, 1958.

Whitaker, J., dissented.

Newell W. Ellison, Washington, D. C., Henry M. Hogan, Detroit, Mich., Daniel M. Gribbon, Washington, D. C., Calvert Thomas, and J. C. Siegesmund, Jr., Detroit, Mich., on the briefs, for plaintiff.

Harold S. Larsen, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Washington, D. C., on the brief, for defendant.

MADDEN. Judge.

This is the latest in the succession of suits brought by this plaintiff to recover excise taxes exacted from it by the Government in connection with the plaintiff's manufacture and sale of electric refrigerators. The first of the cases is reported in 121 F.Supp. 932, 128 Ct.Cl. 465. In that opinion, which was on the merits, the plaintiff's five year warranty of the refrigerating unit in its refrigerators, the so-called "Five Year Protection Plan", is described in detail and its history is recited. The court held that the actual expense of the plaintiff's repair and replacement of these units in satisfaction of its warranty was an "allowance" within the meaning of section 3443(a) (2) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3443(a) (2), and that the plaintiff could recover on that basis. Two judges, dissenting in part, would have held that the five dollar charge made by the plaintiff for the five year warranty was not a part of the price of the refrigerator and was therefore entirely exempt from the excise tax.

In the plaintiff's second case, No. 49428, decided on the merits November 7, 1956, the court's decision was the same as in the first. Chief Judge Jones and Judge Laramore concurred, but with the express statement that "recovery in such cases is and should be limited to the cost incident to a protective plan that goes beyond the customary guarantee or service applicable in the trade generally."

In the instant case the court has made a finding that the five year warranty of refrigerating units has been customary in the trade generally during the years involved in all of the plaintiff's suits. It thus becomes evident that the concurrence of Chief Judge Jones and Judge Laramore in the second case resulted from matters regarded by them as vital to the decision but about which no facts appeared of record in either the first or second case.

It will be remembered that the original General Motors case, decided in 1954, had not directly raised the issue of the custom in the trade as to the five year warranty.' The plaintiff's brief and the court's finding 17, in that case, referred only to the fact that the one year warranty had become standardized in the refrigeration industry. While the record did not show clearly that the extended warranty for the sealed units was not adopted by the trade, the clear implication of the few references in the record is to the effect that it was not the custom in the trade generally. Therefore, the issue in the present case and the issue in the first General Motors case are different, both factually and legally, a matter which we will discuss more fully below.

In the plaintiff's third case, No. 55–56, Ct.Cl., 147 F.Supp. 739, decided January 16, 1957, the plaintiff sought to press the court's previous decisions to what the plaintiff insisted was their logical conclusion. It urged that the cost of fulfilling its one year warranty of all parts of its refrigerators should be treated as an "allowance" under section 3443(a) (2). It also made the same contentions as to its five year warranty of its refrigerating units which it had made in the earlier cases. The court rejected the plaintiff's contention as to the one year warranty, and adopted the plaintiff's original contention as to the five year warranty of the refrigerating unit. It held that the five dollars charged for the five year warranty was not a part of the price of the refrigerator and hence was not subject to the excise tax. Judge Littleton, concurring in part and dissenting in part, would have adhered to the court's first decision based on the allowance theory, because he thought that the doctrine of collateral estoppel required that decision.

The writer of this opinion dissented, taking the position that the price paid for warranties in connection with sales of refrigerators was a taxable part of the purchase price, and that the cost of fulfilling the warranties was not an "allowance" within the meaning of section 3443(a) (2). The latter position was, of course, a departure from his earlier views.

The court in the plaintiff's third case referred the case to a trial commissioner of the court to take evidence only on the question of the reasonableness of the plaintiff's five dollar charge in relation to the actual cost of fulfilling the warranty. On June 12, 1957, the trial commissioner was also ordered to take evidence on the question of whether the five year warranty was customary in the trade during the years in question.

█ As stated above, the court has now made a finding of fact that the five year warranty in question is customary in the trade, and has been so almost from the time that the plaintiff introduced it. The fact which was not made to appear in the earlier cases, but which the Chief Judge and Judge Laramore regarded as vital, is now a fact of record. A majority of the court is therefore of the opinion that the plaintiff is not entitled to recover, because the price paid for these warranties was a taxable part of the purchase price of the article sold.

The instant case might appear to suggest a problem of collateral estoppel. The effect of the application of the doctrine would be to set the plaintiff apart from its competitors and from all other taxpayers similarly situated. Such a doctrine of "repose" would have to have a truly compelling reason behind it.

█ The Supreme Court of the United States in Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, makes plain its view that the doctrine of collateral estoppel is to be sparingly used in tax cases. The Court said, 333 U.S. at page 601, 68 S.Ct. at page 721:

"And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if

the relevant facts in the two cases are separable, even though they may be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue."

As we have stated above, the issue in the original General Motors decision and the issue presently before the court are different. The Sunnen case in 333 U.S. at page 599, 67 S.Ct. at page 720, makes it clear that the doctrine of collateral estoppel shall only be applied when the issues remain "static, factually and legally." That is not our case.

The writer of this opinion expressed his views on the collateral estoppel question in Engineer's Club of Philadelphia v. United States, 42 F.Supp. 182, 95 Ct.Cl. 42, which was cited with apparent approval in Sunnen, 333 U.S. at page 601, 67 S.Ct. 715.

The plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, Judge, concur.

LITTLETON, Judge (concurring).

On the occasion of the court's opinion in this case on January 16, 1957, I dissented from the holding that the charge made by the plaintiff for the contract to maintain the units after the expiration of the one year warranty was a separate charge in the nature of insurance and excludable from taxation as such under section 3441(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3441(a) so that plaintiff became entitled to recover taxes paid on the $5 charges collected from purchasers of such units. The ground of my dissent was that under

the doctrine of collateral estoppel the court was bound by its decision rendered in General Motors v. United States, 121 F.Supp. 932, 128 Ct.Cl. 465, in which cross petitions for *certiorari* were denied by the Supreme Court on February 14, 1955, 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737. I was of the opinion that the doctrine of collateral estoppel was applicable because at that stage of the proceedings, i. e., on plaintiff's motion for summary judgment in the third General Motors case (No. 55–56), there appeared to be no change in the facts or issues from the first General Motors case. Upon remand to the trial commissioner of the court for hearing it was established as a fact that the extended warranty for more than one year had become a custom in the industry and was a custom in the industry during the period involved in the first General Motors case. This fact I believe to be most material although it was not raised nor was it a matter of record in the first or second General Motors cases, and I agree with Chief Judge Jones and Judge Laramore that it raises a new issue of great importance. Accordingly, since we now are faced with "points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time", I am of the opinion that the parties are free to litigate such points in this proceeding and that the doctrine of collateral estoppel is no longer applicable. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898.

Reaching the merits, I concur in the majority's opinion thereon.

WHITAKER, Judge (dissenting).

In my opinion, the result now reached by the majority is inconsistent with the court's opinion delivered on January 16, 1957. In that opinion we held that the $5 charge made by plaintiff for an agreement to maintain the freezing units in its refrigerators for a period of four years, in addition to the customary one-year manufacturer's warranty, was not a part of the sales price.

The case was then referred to Commissioner Akers to take proof on two things: first, whether the charge for the agreement to keep the freezing unit in repair for four years, in addition to the usual one-year warranty, was reasonable; and, second, whether in the taxable years in question it had become the custom of the trade for the manufacturer to agree to keep the freezing unit in repair for five years.

On the first question he found the charges were reasonable, and on the second he found that this was the custom of the trade. It is this latter finding that has led astray at least some of by brethren.

Notwithstanding this finding, I still think the agreement to keep the freezing units in repair for four years, in addition to the usual one-year warranty, was no part of the sales price of the refrigerator, but was something the manufacturer agreed to give the purchaser, in addition to a refrigerator free of defects from workmanship and material.

The purchaser of an article from a manufacturer is entitled to no more than a warranty that the thing sold is free of defects in material and workmanship.

In the various trades the manufacturer is accustomed to fix a limited period within which such defects are supposed to appear, which varies with the article sold. In the case of electric refrigerators, the proof in the General Motors case clearly shows that the customary period from the time electric refrigerators were put on the market in 1920 until 1936 was one year. The proof also shows that if something went wrong with the freezing unit after the one-year warranty period, it had to be repaired at the customer's expense. Because such repairs were frequently unsatisfactory, the General Motors in 1933 offered to its customers an agreement to make necessary repairs after the one year period for a charge of $6 per year.

Two years later, in 1935, General Motors offered its customers an agreement to keep the freezing unit in repair for a period of four years. Under the 1933 agreement this would have cost the customer $24, but General Motors reduced its price for this to $10. The following year General Motors further reduced its price to $5, for the agreement to keep the machine in repair for four years after the expiration of the one-year warranty; but, while the former agreements were optional with the purchaser, the new plan, called the "Protection Plan", was obligatory.

But, even though the purchaser was required to take and pay for this "Protection Plan", there can be no doubt that it gave the purchaser something in addition to the obligation of the manufacturer to remedy defects in material and workmanship, which had to appear within the one-year warranty period, in order to hold the manufacturer liable to make them without expense to the customer.

General Motors, being perhaps the largest manufacturer of electrical refrigerators, set the pattern for the industry, and when General Motors put into effect its "Protection Plan", agreeing to keep the machine in repair for four additional years, whether the defects occurred from wear and tear or from any other cause, other manufacturers felt obliged to follow its example. The result was that today all manufacturers of electric refrigerators sell their machines with the agreement to keep them in repair for a period of four years, in addition to the customary one-year warranty.

But, notwithstanding the fact that this has become the custom of the trade, it is nevertheless true that this "Protection Plan", under which the manufacturer agrees to keep the machine in repair for four years in addition to the usual one-year warranty, is an agreement over and above the obligation of the manufacturer to make repairs appearing within the usual one-year warranty period, that is, repairs necessitated by defects in material and workmanship.

The usual one-year warranty was given to discharge the manufacturer's obligation to sell a sound article, free from

defects in material and workmanship. He could not make a charge therefor and claim that it was not a part of the sales price, because the sales price was for a sound machine—all as more fully explained in our prior opinion. But, the manufacturer could properly make a charge for a maintenance contract, beginning after the end of the warranty period, because this was a contract to make repairs not required under its warranty that the machine it had sold was free from defects.

I think this is a proper analysis of the transaction. If it is, the $5 charge is no part of the sales price of the refrigerator, and, thus, is not subject to the excise tax.

For this reason, I dissent.