Sumner Rhubarb Growers' Association v. Commissioner.
Sumner Rhubarb Growers' Ass'n v. Commissioner
Docket No. 26291.
United States Tax Court
1951 Tax Ct. Memo LEXIS 229; 10 T.C.M. (CCH) 465; T.C.M. (RIA) 51146; May 17, 1951
John W. Fishburne, Esq., for the petitioners. Wilford H. Payne, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in income tax, excess profits tax and declared value excess-profits tax as follows: Excess
Profits
Declared Value
Year
Income Tax
Tax
Excess-Profits Tax
Fiscal period Jan. 1, 1939 to May 31, 1939
$ 39.06
$42.61
Fiscal year ended May 31, 1940
252.67
$275.64
Fiscal year ended May 31, 1941
211.93
217.03
Fiscal year ended May 31, 1942
186.88
135.33
Fiscal year ended May 31, 1946
1,219.00
Fiscal year ended May 31, 1947
3,117.10
The sole issue is whether petitioner is exempt from income tax, excess profits tax and declared value excess-profits tax for the above taxable *230 years under section 101(12), Internal Revenue Code. Findings of Fact Petitioner is a corporation organized April 30, 1930, and existing under the laws of the State of Washington. The articles of incorporation stated that it was organized as a "cooperative association or corporation under Chapter XIX of the Laws of 1913 and the amendments thereto". Petitioner filed for the fiscal years ended May 31, 1944, May 31, 1945, May 31, 1946, and May 31, 1947, Form 990, information return of organizations "exempt from income tax under section 101 of the Internal Revenue Code, or under corresponding provisions of prior revenue acts" with the collector of internal revenue for the district of Washington. Petitioner's articles of incorporation stated that the purposes for which petitioner was formed were: "(a) To pack, process, can, store, warehouse, handle, and market fruit, vegetables, rhubard [rhubarb] and other agricultural and horticultural products grown in the State of Washington by any means and in any way whatsoever. "(b) To buy, process, pack, handle and sell all kinds of agricultural and horticultural products, both for its own *231 account and on commission for others, and to contract accordingly, and to operate warehouses, canneries, cold storage plants and packing houses, wherever necessary or expedient in the carrying on of the company's business. "(c) To lend money upon and to negotiate loans upon agricultural and horticultural products; to borrow money and to establish domestic and foreign agencies to carry on the general purposes of the corporation. "(d) To buy or otherwise acquire, to own, operate, mortgage, lease, sell or otherwise dispose of any and all kinds of personal property. "(e) To promote, do, acquire, hold and dispose of anything incidental to or necessary, convenient or proper to carry out any of the purposes aforesaid, or anything which may be useful, incidental or auxiliary to accomplish any of the purposes of the corporation. "(f) To conduct public warehouses. "(g) The primary purpose for the organization of this corporation is to handle the agricultural and horticultural products of its members upon a cooperative basis and to handle all of such products of members who shall sign the standard marketing agreement of the association upon the basis of actual cost to the association *232 and an amount apportioned over the entire operations of any one season, not to exceed eight per cent of the then issued common capital stock of this corporation, and an amount sufficient for proper reserves for advertising, general commercial hazards, betterments, development work, and other secondary charges." The authorized capital of the corporation was 1,500 shares of capital stock of a par value of $1 per share. For its fiscal year ended May 31, 1947, petitioner had $1,214 of issued capital stock at the beginning of the year and $1,202 at the end of that year. The by-laws of the corporation provided that its powers should be exercised by a board of trustees to be elected annually by the stockholders. The board of trustees was generally referred to as the board of directors. The directors' powers included the power to conduct, manage and control the affairs and business activities and to make necessary rules and regulations for guidance of its officers; to appoint a manager; to borrow money; to issue certificates of capital stock; to transfer stock and to purchase any and all of the shares of any stockholder at book value whenever any stockholder should fail to sign the marketing *233 agreement or cease to be engaged in the production of rhubarb. No stockholder could dispose of his stock without first offering it to the corporation. The directors receive no compensation but the manager receives a salary. The manager handles the sales. By signing the standard marketing agreement as prescribed by the corporation and paying $1, a farmer (rhubarb grower) could thereby become a member and receive at least one share of capital stock. The marketing agreements executed by petitioner and its members have been substantially the same for all years. They provided, among other things, as follows: "1. The price to be paid by the Association shall be the market price as conclusively determined by the manager of the Association from time to time, f.o.b. cars, Summer, Pierce County, Washington, which price shall be paid to the grower from time to time as soon as returns from resales are available, less, however, a deduction of one cent per crate for all hothouse rhubarb delivered. "2. From time to time there shall be issued to the Grower certificates of stock in the Association to the amount of the deductions made from the purchase price of the produce delivered by the Grower *234 as in the foregoing paragraph set forth, such stock to be issued at par and in such denominations as the Association may determine. * * *
"6. This agreement shall be binding upon the Grower, his representatives, successors and assigns, during the period above mentioned, as long as he raises hothouse rhubarb directly or indirectly or has the legal right to exercise ownership or control of any thereof or any interest therein or any land on which such product is grown during the term of this contract. "7. This agreement is one of a series generally similar in terms, comprising with all such agreements signed by individual Growers, one single contract between the Association and the said Growers, mutually and individually obligated under all the terms thereof. The Association shall be deemed to be acting, in its own name, for all of such Growers in any action or legal proceeding on or arising out of this contract." The members of petitioner receive boxes at cost from petitioner for packing the rhubarb. Petitioner is able to buy the boxes in large quantities at cheaper prices than the individual grower would have to pay. The rhubarb is packed in boxes by the growers and turned *235 over to petitioner for shipping and marketing under petitioners' name. Each week during the harvesting season, which is from January to May of each year, the amount received by petitioner from sale of the rhubarb brought in by the members during that week is pooled and distributed according to the quantity each member brought in. The member receives back the full sale price of every box of rhubarb, minus a handling charge which has generally been 20 cents per box and minus a charge of one or two cents a box for a reserve for contingencies. The member pays in no money except the $1 it costs him to join petitioner. The gross sales price of the rhubarb is shown in petitioner's books. Petitioner keeps its own bank account for operating expenses. On May 29, 1947, the Deputy Commissioner of Internal Revenue wrote petitioner, relative to claims of petitioner for refund in the total amount of $366.03 of employers' tax for the period from October 1, 1942, through June 30, 1946, "Although it is stated on your claims that your Association is a cooperative farming organization for marketing purposes and is exempt from income tax under Section 101(1) of the Internal Revenue Code *236 , the records of this office" indicated only "that your Association, * * * was granted exemption under Section 103(12) of the Revenue Act of 1928 and prior acts which corresponds to Section 101(12) of the Internal Revenue Code". Accordingly, the letter stated, "If exemption has not been granted under Section 101(1) of the Internal Revenue Code and it is your desire to apply for such exemption, the necessary forms and information may be obtained from the office of the collector of internal revenue for your district." On July 25, 1947, petitioner executed Form 1024, affidavit for corporations claiming exemption under section 101(1), of the Code. On October 27, 1947, the Deputy Commissioner wrote petitioner that "Form 1024 does not appear to be the correct exemption affidavit to be used by an organization of your type" and requested that Form 1028, affidavit for corporations claiming exemption under section 101(12), Internal Revenue Code, be executed by petitioner and submitted, "together with a classified statement of your receipts and expenditures for the fiscal year ended May 31, 1947, and a complete statement *237 of your assets and liabilities as of the end of that year." On November 6, 1947, petitioner, by its attorney-in-fact, E. S. Watts, C.P.A., wrote the Commissioner: "It would seem senseless for us to execute the enclosed forms 1028 for exemption under section 101(12) when according to your letter of May 29, 1947, this organization already has exemption under the said subsection." By letter dated December 15, 1947, the Deputy Commissioner renewed his request of October 27, 1947, that petitioner submit Form 1028 and other information. On December 17, 1947, the collector of internal revenue at Tacoma, Washington, notified petitioner that it was on the delinquent list for an information return, Form 990, covering the fiscal year ended May 31, 1947. On December 26, 1947, petitioner, by its attorney-in-fact, wrote the Commissioner again refusing to execute Form 1028, because "We will not agree that our income exemption should not be under Sec. 101(1), so naturally we will not make application under Sec. 101(12)." Petitioner also enclosed its information return, Form 990, for the fiscal year ended May 31, 1947. On March 12, 1948, the Deputy Commissioner wrote petitioner, referring *238 to their previous correspondence: "The letters indicate that you do not intend to furnish the required information, since in your letter of January 21, 1948 it is stated that unless this Bureau is satisfied that you should have exemption from income tax under section 101(1) you will immediately upon receipt of advice to that effect initiate in the Federal Court the proper action to give you your proper position under the revenue laws. "Since you have not shown that you are now being operated in such a manner as to be entitled to exemption from Federal income tax under section 101 of the Internal Revenue Code or any other provisions of the Code, Bureau letter to you dated September 3, 1931, holding that you were entitled to exemption under section 103(12) of the Revenue Act of 1928 is hereby revoked, effective January 1, 1939, which is the effective date of the Internal Revenue Code. You will, therefore, be required to file Federal income tax returns, beginning with the year 1939. "The collector of internal revenue at Tacoma, Washington, is being instructed to take up the matter with you with a view to obtaining the required income tax returns." On March 17, 1948, petitioner, *239 by its attorney-in-fact, wrote the Commissioner reiterating its position that it did "not wish to file exemption claim under Sec. 101(12) when we claim we are entitled to it under Sec. 101(1)." On May 19, 1948, the Deputy Commissioner wrote petitioner, stating that "As you have failed to submit the necessary information, Bureau ruling of March 12, 1948, revoking the ruling of September 3, 1931, * * * remains in effect." On May 25, 1948, petitioner, by its attorney-in-fact, wrote the Commissioner again reiterating its position that "until disposition has been made of our pending claim for refund we do refuse to file application for exemption under Sec. 101(12)." On July 1, 1948, petitioner, by its attorney-in-fact, wrote the Commissioner again reiterating its position that "since we claim income tax exemption under Sec. 101(1) as well as Sec. 101(12), we did not wish to execute the affidavit claiming exemption only under Sec. 101(12)." On July 12, 1948, petitioner, by its attorney-in-fact, wrote the Commissioner: "Now enclosed you will find the affidavit form 1028 which you will notice we have executed under Sec. 101 and have inked out any reference to a subsection. We do *240 not know what information this will give you other than what you already have, but it was just recently explained to the writer by a deputy collector that this is a way the affidavit could have been executed to have saved the Government and this agricultural association needless expense. If we had known this before, we would have been glad to file the form in this manner." On November 4, 1948, petitioner, by its attorney-in-fact, wrote the Commissioner: "There has been no change in our method of operations under which we were exempt from income tax from inception of the Corporation in 1931 down to date and since we have a case pending in Federal Court which should adjudicate our position under section 101 we will make no further filing of form 1028 until that case has been decided. The docket number of that case is 1157. If that case does not decide our income tax exemption by deciding that we are in no way subject to Social Security Taxes then we will petition the Tax Court on any income tax assessments proposed." Petitioner brought suit against Clark Squire, Collector of Internal Revenue, in the United States District Court of Western District of Washington, Southern Division, *241 to recover a refund of $89.14 in employment taxes for the years 1943 through 1946 which had been paid by petitioner upon the wages of its office personnel. The claims for refund had originally aggregated $366.03 but the Commissioner had allowed the claims insofar as they covered the tax on the wages of employees other than office employees. The District Court, after a hearing, held that under the provisions of sections 101(1) and 101(12), of the Code, plaintiff (petitioner herein) was exempt from social security tax upon any of its employees and entered judgment in favor of plaintiff for the full amount plus interest and costs. On appeal, in Squire v. Sumner Rhubarb Growers' Ass'n. (C.A. 9, 1950), 184 Fed. (2d) 94, the judgment of the District Court was reversed, the Court of Appeals for the Ninth Circuit holding that appellee (petitioner herein) was not exempt under section 101(1) of the Code, and that though the District Court was correct in holding appellee exempt under section 101(12) of the Code, nevertheless services of the office employees in question were not "agricultural labor" as defined in 26 U.S.C.A. § 1426 *242 (h)(4), and therefore appellee was not exempt from payment of employment taxes on wages of these office employees. After notification by the Deputy Commissioner in his letter of March 12, 1948, above, that petitioner would "be required to file Federal income tax returns, beginning with the year 1939", the following corporation returns covering the years here in question were subsequently prepared and filed in petitioner's behalf by the deputy collector for the district of Washington: Year
Return
Fiscal period Jan. 1, 1939, to May 31, 1939
Income, Declared Value Excess-Profits and De-
fense Tax
Fiscal year ended May 31, 1940
Income, Declared Value Excess-Profits and De-
fense Tax
Fiscal year ended May 31, 1941
Income, Declared Value Excess-Profits and De-
fense Tax
Fiscal year ended May 31, 1942
Income and Declared Value Excess-Profits Tax
Fiscal year ended May 31, 1946
Income and Declared Value Excess-Profits Tax
Fiscal year ended May 31, 1947
Income Tax
Petitioner's balance sheet as of May 31, 1946, was as follows: BALANCE SHEET
As at May 31, 1946
ASSETS
Cash in Bank
$ 6,887.49
Cash on Hand
6.22
$ 6,893.71
State Unemployment Taxes - (Part)
189.30
Inventories: Floor Supplies
787.53
Advertising
918.00
Field Boxes
2,233.89
Hothouse Boxes
5,011.20
8,950.62
Current
$16,033.63
Floor Equipment
$497.45
Office Equipment
748.25
1,245.70
Less, Depreciation Reserve
1,245.70
Total Assets
$16,033.63
LIABILITIES
Social Security
$ 2.56
Undistributed Proceeds (1944 Season)
900.83
Undistributed Proceeds
4,282.25
Current
$ 5,185.64
EQUITIES
Capital Stock Outstanding
$ 1,214.00
Capital Surplus June 1, 1945
$2,758.39
Plus: Bank Error
$ .60
Dormant Refund
47.80
48.40
2,709.99
Reserve for Contingencies
6,924.00
Members' Equity
10,847.99
Total Liabilities and Equities
$16,033.63
*243 Petitioner's statement of operations and distributions for the year ended May 31, 1946, was as follows: STATEMENT OF OPERATIONS AND DISTRIBUTIONS
Year ended May 31, 1946
Sales: Hothouse Rhubarb (92,193 Boxes)
$208,698.14
Field Rhubarb
13,677.65
Price Adjustments - Net
2,698.76
$225,074.55
Adjustments by Charges to Growers: Hothouses
434.06
Field
61.86
495.92
Outside Sales: Boxes and Supplies
12.50
Outside Discount Collected
9.90
Interest Charged Growers
45.31
Discount Earned
109.15
164.36
Costs Charged to Growers: Hothouse: Supplies
$ 273.82
Advertising
1,843.86
Brokerage
4,760.00
Boxes
13,677.57
Handling
13,828.95
34,384.20
Field: Supplies
7.00
Brokerage
324.97
Handling
1,005.20
Boxes
1,581.79
2,918.96
37,303.16
Total Revenue and Collected Costs
$263,050.49
Direct Disbursements: Hothouse: Advertising
$ 1,183.89
Supplies
1,350.13
Brokerage
5,101.61
Boxes
11,921.11
19,556.74
Field: Brokerage
315.00
Boxes
1,569.74
1,884.74
Indirect Costs and Handling: Freight and Express
$ 19.52
Federal License and County Tax
21.18
Interest and Discount
49.14
Legal and Auditing
90.00
Treasurer's Fee
100.00
Donations, Dues and Advertising
172.65
Office Supplies and Postage
240.98
Precooling
354.80
Inspection
494.15
Insurance and Bond Premiums
552.62
Rent, Heat and Light
684.42
Telephone and Telegraph
748.10
Wages
3,244.74
Salaries
7,107.50
13,879.80
Total Expense and Supply Disbursements
35,321.28
Balance
227,729.21
Less: Depreciation Reserve
69.24
Accounts Receivable Error
80.00
Reserve for Contingencies
921.93
1,071.17
For Distribution to Member Growers
226,658.04
Distributions to Growers: Hothouse
208,698.14
Field
13,677.65
222,375.79
Undistributed Proceeds
$ 4,282.25
*244 Petitioner's balance sheet as of May 31, 1947, was as follows: BALANCE SHEET
As at May 31, 1947
ASSETS
Cash in Bank
$ 9,940.39
Cash on Hand
16.41
$ 9,956.80
Hothouse Accounts Receivable
8.00
State Unemployment Department
189.30
Inventories: Floor Supplies
236.35
Advertising
795.60
Field Boxes
225.20
Cartons
2,844.00
Hothouse Boxes
6,483.38
10,584.53
Current
20,738.63
Cold Room Equipment
5,648.66
Less: Depreciation Reserve
564.87
5,083.79
Floor Equipment
$535.40
Office Equipment
748.25
1,283.65
Less: Depreciation Reserve
1,245.70
37.95
Total Assets
$25,860.37
LIABILITIES
Accounts Payable
$ 182.41
Undistributed Proceeds (Prior Seasons)
854.56
Undistributed Proceeds
11,885.39
Current
$12,922.36
EQUITIES
Capital Stock Outstanding
$ 1,202.00
Capital Surplus
2,709.99
Reserve for Contingencies at June 1, 1946
$6,924.00
Addition at 2" per Box
2,102.02
9,026.02
Members' Equity
12,938.01
Total Liabilities and Equities
$25,860.37
Petitioner's statement of operations and distributions for the year ended May 31 1947, was as follows: *245 STATEMENT OF OPERATIONS AND DISTRIBUTIONS
Year ended May 31, 1947
Sales: Hothouse Rhubarb (105,101 Boxes)
$180,220.46
Field Rhubarb
39,794.63
Price Adjustments - Net
3,203.22
$223,218.31
Adjustments by Charges to Growers: Hothouses
517.73
Field
202.04
719.77
Outside Sales: Boxes and Supplies
10.00
Advertising
2.40
Discount Earned
223.27
225.67
Costs Charged to Growers: Hothouse: Supplies
$ 382.64
Pre-Package
2,072.78
Advertising
2,102.02
Brokerage
5,654.51
Handling
21,020.20
Boxes
21,049.48
52,281.63
Field: Supplies
$ 7.20
Brokerage
1,118.03
Handling
4,663.20
Boxes
8,088.16
13,876.59
66,158.22
Total Revenue and Collected Costs
$290,331.97
Direct Disbursements: Hothouse: Advertising
$ 862.02
Supplies
3,254.58
Brokerage
5,522.59
Boxes
18,720.68
28,359.87
Field: Brokerage
905.00
Boxes
7,387.28
8,292.28
Cartons
391.35
Indirect Costs and Handling: County Property Tax
14.53
Social Security
16.34
Treasurer's Fee
100.00
Insurance and Bond Premiums
100.56
Legal and Auditing
101.25
Office Supplies and Postage
138.74
Dues and Advertising
165.50
Interest and Discount
313.71
Inspection
738.00
Telephone and Telegraph
1,066.91
Rent, Heat and Light
1,165.30
Salaries
6,585.25
Wages
6,894.29
17,400.38
Total Expense and Supply Disbursements
54,443.88
Balance
$235,888.09
Less: Depreciation Reserve
564.87
Pre-Package allowances
1,320.72
Reserve for Contingencies
2,102.02
3,987.61
For Distribution to Member Growers
231,900.48
Distributions for Growers: Hothouse
180,220.46
Field
39,794.63
220,015.09
Undistributed Proceeds
$ 11,885.39
*246 The amount of $4,282.25 shown on the balance sheet and on the statement for the year ended May 31, 1946, as "Undistributed Proceeds" has since been distributed. Undistributed proceeds due the growers by agreement with the growers are sometimes left with petitioner during the winter to purchase supplies for the growers. The amounts due are then distributed in the spring. The cash in the bank of $9,940.39 shown on the balance sheet at May 31, 1947, was kept to be used toward the payment of $11,885.39 in undistributed proceeds due the members for the current season. The item on the balance sheet at May 31, 1946, of $900.83 for "Undistributed Proceeds (1944 Season)" was attributable to proceeds due members who had left the territory. Otherwise all proceeds from the sale of rhubard prior to that date had been distributed to members, less the cost of handling and additions to the contingent reserve. The operation of petitioner has been substantially the same from its inception in 1930. In contingent reserve was maintained for unforeseen expenses such as, for instance, losses by freezes on carload shipments. The board of directors of petitioner determined each year the amount of reserve *247 to be set up. The average increase in the contingent reserve over the years of petitioner's operations has amounted to approximately $700 per year. The reserve was not all in cash but a part was in equipment and inventory. In the fiscal year 1946 the amount reported under page 1, of Form 990, item 14(d), "Value of agricultural products marketed (or handled) for members (1) actually produced by such members" corresponded with the amount reported under item 7, page 2, of the form "Gross receipts from business activities," which included "Costs Charged Growers". In 1947 the amount reported under item 14(d), page 1 of Form 990, was only the gross receipts less costs charged growers, which latter were shown under item 7, page 2. Petitioner was an exempt organization within the meaning of section 101(12) of the Internal Revenue Code for the years involved. Opinion Petitioner corporation was originally granted exemption on September 3, 1931, under the provisions of section 103(12) of the Revenue Act of 1928 according exemption to farmers' and fruit growers' cooperatives. That section is in all material respects similar to the present provisions of section 101(12) [1] of the Internal Revenue Code *248 , which is involved in this proceeding and applicable for taxable years beginning after December 1, 1938. On March 12, 1948, respondent arbitrarily revoked its letter of September 3, 1931, granting petitioner exemption under section 103(12) of the Revenue Act of 1928, the revocation to be effective retroactively as of January 1, 1939. *249 The sole question is whether petitioner is entitled to exemption under section 101(12) for the years here involved, namely, the period January 1 to May 31, 1939, and the fiscal years ended May 31, 1940, 1941, 1942, 1946 and 1947. In Squire, Collector of Internal Revenue v. Sumner Rhubarb Growers' Ass'n (C.A. 9, 1950), 184 Fed. (2d) 94, in which the issue was whether appellee, petitioner herein, was excepted from payment of employment taxes under the Social Security Act on wages of its office personnel for the years 1943 through 1946, the Court of Appeals for the Ninth Circuit, in deciding that it was not, found it necessary to consider whether petitioner was exempt from income tax under section 101(12) and stated that it was so exempt. However, appellant, the collector of internal revenue, in the words of the court, "made no point" of whether petitioner was exempt from income tax under section 101(12). Accordingly, the point not being controverted, the Commissioner is not collaterally estopped to raise it in this proceeding for the different years here before us, even though, as we have found, there has been no change in petitioner's method of operation since its inception *250 in 1930. Commissioner v. Sunnen, 333 U.S. 591; Sam Schnitzer, 13 T.C. 43; aff'd (C.A. 9, 1950), 183 Fed. (2d) 70; certiorari denied, 340 U.S. 911. However, on the merits, we reach the same conclusion on the record here before us for the years here involved as did the Court of Appeals in the above proceeding involving other years, namely, that petitioner "fits exactly into the wording of this statute". (Section 101(12)). Petitioner is an association of rhubarb growers who joined together in a group to facilitate the packing, processing, shipping and sale of their products. Petitioner's sales are handled by a salaried manager who is selected by the directors, the latter being members elected as directors annually and serving without compensation. The members receive boxes at cost from petitioner for packing the rhubarb. The rhubarb is packed in the boxes by the members and turned over to petitioner for shipping and sale under petitioner's name. Each week during the harvesting season, which is from January to May of each year, the amount received by petitioner from that week's sales of rhubarb is pooled and distributed according *251 to the quantity each member brought in. The member receives back the full sale price of every box of rhubarb, minus a handling charge which has generally been twenty cents per box and minus a charge of one or two cents a box for a reserve for contingencies. It is quite clear that these operations are within the requirements of section 101(12) set forth above. As we have said, there has been no change in petitioner's method of operation since its inception in 1930. Respondent, however, maintains that petitioner's Form 990, the information return for organizations exempt under section 101, Internal Revenue Code, for the fiscal year 1947, "showing a complete change over 1946 in the method of handling and reporting produce sales and charges to growers was ample justification for respondent's action in withdrawing exemption". However, scrutiny of the Forms 990 for those two years shows, as set forth in our findings, that precisely the same method of operation was revealed for both years; the information was merely reflected in a different place on the form in the two years. The testimony of E. S. Watts, petitioner's auditor who prepared the forms, in answer to the *252 question of counsel for respondent as to why the change was made, was simply that "we decided we were making the form wrong". There seems no reason to regard this testimony with suspicion. Certainly, at any rate, this change in petitioner's method of reporting its operations, the operations themselves remaining unchanged, does not justify a holding that petitioner was thereafter no longer entitled to exemption under section 101(12). Respondent also contends that there is no satisfactory showing by petitioner of any consistent policy to distribute the proceeds of each year's operations to its members. The record does not support this contention. In the fiscal year 1946 of the amount of $226,658.04 for distribution to member growers (after deduction of costs of $35,321.28, and small amounts for reserves for depreciation and contingencies, from total revenue and collected costs for that year of $263,050.49), the amount of $222,375.79 was distributed in that fiscal year to growers. The balance of $4,282.25 in undistributed proceeds left after audit was shown as a liability on the balance sheet and distributed during the following season, being left temporarily with petitioner by agreement *253 with the growers to purchase supplies for the growers. The only proceeds carried over from any prior seasons consisted only of some $900.83 from the 1944 season (1945 fiscal year), also shown as a liability, attributable to proceeds due certain members who had left the territory. In the fiscal year 1947, of the amount of $231,900.48 for distribution to member growers, the amount of $220,015.09 was distributed in that year. The undistributed proceeds of $11,885.39 were set up as a liability, petitioner's auditor testifying that cash on hand as of the same date, May 31, 1947, in the amount of $9,940.39 was held toward the payment in the following season of the balance due the members. No period beyond May 31, 1947, is before us in this proceeding but we think petitioner has shown satisfactorily that its settled policy was to distribute to its members the proceeds of its operations. Respondent maintains that there was no "legal obligation on the part of petitioner, prior to the receipt of its income, to return to its members all of the proceeds of sales and operations in excess of actual costs," and that such amounts were "subject to the control of the Board of Directors and depended *254 upon its determination as to if and when they should be distributed." Accordingly, respondent contends, citing American Box Shook Export Association v. Commissioner (C.A. 9, 1946), 156 Fed. (2d) 629; affirming 4 T.C. 758, that there is no justification for relieving petitioner from tax. This contention is without merit. The marketing agreements which petitioner signed with its members clearly provided that petitioner was to pay to the members the market price received for the rhubarb (less a deduction of one cent per box for additions to the contingent reserve) and constitute legal obligations. Accordingly, American Box Shook Export Association v. Commissioner, supra, where the requisite legal obligation was lacking, is not in point. Furthermore that case did not specifically involve the question of statutory exemption under section 101(12), the only question in the present proceeding. Respondent also mentions that "no credits were set up on the books of account in favor of the members with reference to such undistributed amounts", to support his contention that petitioner was under no legal obligation to return these undistributed amounts to *255 the members. The marketing agreements provided the legal obligation, as we have said. Furthermore, the total undistributed amounts were set up as liabilities by petitioner's auditor, as the facts show, the auditor testifying they were to be entered on petitioner's books in the same menner, the amounts due each member to be computed by petitioner on the basis of the number of boxes he turned in. Respondent's own regulations (Regulations 111, section 29.101(12)-1) state "The Code does not require, however, that the association keep ledger accounts with each producer selling through the association". Clearly, there is nothing in petitioner's method of handling distributions to its members, either in practice or on its balance sheets and books, to justify denial of exemption under section 101(12). Respondent maintains that the annual deductions by petitioner from the proceeds of the produce sold for a "large and consistently growing" contingent reserve warrants inquiry as to petitioner's right to exemption under section 101(12). The facts show that this reserve increased at an average rate of about $700 per year from petitioner's inception through the taxable years involved, and totaled *256 $9,026.02 as of May 31, 1947. This reserve was kept for possible contingencies, such as, for instance, losses by freezes on carload shipments. Not all of it was in cash; a part was in equipment and inventory. Section 101(12) provides that exemption shall not be denied cooperative associations otherwise qualified because there is accumulated and maintained by it "a reasonable reserve for any necessary purpose". We would certainly think the maintenance of a reserve for contingencies a necessary precaution on the part of a cooperative association engaged in marketing perishables. Moreover, in view of the volume of business handled by petitioner for its members, - well over $200,000 annually in both 1946 and 1947, - we can not regard additions to this reserve for contingencies of a mere $700 annually as unreasonable. We conclude that petitioner is entitled to exemption under section 101(12) of the Code from the taxes here involved. Decision will be entered for the petitioner. Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - * * *
(12) Farmers', fruit growers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses. * * * nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose. * * *↩