**ANDERSON, CLAYTON & CO.**

v.

**UNITED STATES of America.**

**Civ. A. No. 72-H-188.**

United States District Court,
S. D. Texas,
Houston Division.

Nov. 21, 1974.

C. W. Wellen, Charles W. Hall, Steven C. Salch, Fulbright & Jaworski, Houston, Tex., for plaintiff.

Mary Sinderson, Asst. U. S. Atty., Houston, Tex., for defendant.

*Memorandum Opinion:*

SINGLETON, District Judge.

This action is brought for the recovery of internal revenue taxes and other sums assessed and collected by the Government. Jurisdiction of the action is conferred by 28 U.S.C. § 1346.

The case has been submitted to the court on stipulations of facts and briefs on the law, and the court has made its determinations upon these.

Anderson, Clayton is a corporation organized and existing under the laws of Delaware, with certificate of authority to transact business in Texas and has its domicile and principal place of business in Houston. It is a large, widely-held, publicly-owned corporation whose business activities and those of its subsidiaries are numerous, international in scope, and include merchandising of cotton, coffee, vegetable oils and other commodities, financing of various crops, manufacturing and sale of consumer and animal food products, warehousing and storage, and insurance among other things.

This case concerns various complications arising from the actions of Anderson, Clayton in seeking to utilize Subpart F of the Internal Revenue Code of 1954 (26 U.S.C. §§ 951–964) and the foreign tax credit provisions of the code (26 U.S.C. § 904 et seq.).

Of the three issues which were presented to the court for determination on stipulation, two remain. The issue of the propriety of plaintiff's claim for direct foreign tax credit for $159,070.03 paid in Mexican taxes for dividends received from its Mexican subsidiaries has been disposed of. Government in Third Stipulation, 17(c) conceded that plaintiff is entitled to direct foreign tax credit equal to the entire amount of such tax paid with respect to amounts distributed as dividends by the Mexican subsidiaries in fiscal 1964.

Therefore, because it is undisputed that plaintiff was entitled to direct foreign tax credit under section 901 of the Internal Revenue Code of 1954 with respect to dividends received from its Mexican subsidiaries in its taxable year ended July 31, 1974, the court finds for the plaintiff on this question.

The first of the two remaining questions is whether or not, for purposes of computing the limitations upon the plaintiff's allowable foreign tax credit for fiscal 1964 under section 904(a)(1) of the code, attributable to the $4,684,233.-96 minimum distribution to plaintiff by Lausanne:[1] (1) was at least $13,659.00 of the minimum distribution attributable to foreign base company sales income earned by its Swiss subsidiary, Lausanne, derived from sources within Argentina, (2) was at least $3,223,290.00 of such minimum distribution, attributable to foreign base company sales income earned by Lausanne, derived from sources within Brazil, and (3) was at least $15,517.49 of such minimum distributions attributable to foreign base company sales income earned by Lausanne, derived from sources within Peru.

Subpart F was added to the Internal Revenue Code of 1954 effective October 16, 1962. It was designed to deal with United States taxpayers who owned controlling interests in foreign corporations and utilized those corporations to abuse the foreign tax credit laws. Under Subpart F the United States shareholder of a controlled foreign corporation is required to report as its own income "Subpart F Income." For purposes of this case Subpart F income consisted of "foreign base company income," i. e., income earned by the controlled foreign corporation outside of the country under whose laws it was organized. The United States taxpayer can reduce or eliminate its Subpart F income under the provisions of section 963 of the code by electing to have the controlled foreign corporation make what is called a "minimum distribution" of its earnings and profits to its United States shareholders. In this case, the United States shareholder would report the minimum distribution as dividend income in place of the Subpart F income which it would otherwise be required to report.

Plaintiff reported for federal tax purposes for the fiscal year 1964 a minimum distribution of $4,684,233.96 from its Swiss subsidiary, Lausanne. Lau-

---

1. "Lausanne" refers to Anderson, Clayton & Co., S. A., Anderson, Clayton's Swiss subsidiary.

sanne had purchased during fiscal 1964 commodities grown or produced within Argentina, Brazil, and Peru from Anderson, Clayton subsidiaries domiciled in those countries. These commodities were resold by Lausanne in those countries to plaintiff at arm's length transactions and to unaffiliated customers at the market price prevailing at the time. From these sales Lausanne realized income of $4,344,186.31 as a result of purchases and sales of other income in Brazil, $65,213.90 from Argentina, and $19,984.23 from Peru. Lausanne realized during that year $1,614,219.27 in income from other sources.

When it computed the per-country limitation on its foreign tax credits, however, the plaintiff treated $3,233,293.00 of the minimum distribution which it had reported as income from Lausanne, as income sourced in Brazil. In the same way, $13,659.00 of the minimum distribution was treated as sourced in Argentina and $16,842.00 of the minimum distribution as sourced in Peru. The Government concluded that all of the distribution from Lausanne reported on its fiscal 1964 tax return should be considered as income from Switzerland, the country of Lausanne's incorporation, when applying the per-country limitation on foreign tax credits as provided in Section 904(a)(1) of the Code.[2]

The plaintiff is seeking to show that the funds have their true source in Peru, Argentina, and Brazil, respectively, since Lausanne bought the commodities in those countries and then resold them there. Each party agrees that of the minimum distribution at least $13,659.00 came from Argentine products; $3,223,290.00 came from Brazilian products; and $15,517.49 came from Peruvian products. What is in dispute is the source of the funds as they came from Lausanne to Anderson, Clayton, for purposes of figuring Anderson, Clayton's foreign tax credit limitation.

The limitation is figured by a formula which divides the amount of income from sources within the foreign country by the taxpayer's entire income and then multiplies that figure by the taxpayer's United States income tax liability.

There is no dispute here over the amount of tax paid by the plaintiff and subsidiaries to Argentina, Brazil, and Peru. The dispute concerns the legal source of the income, whether Argentina, Brazil, Peru, or Switzerland. Lausanne paid taxes to Switzerland. The South American subsidiaries paid taxes to the South American countries. Lausanne did not pay taxes to the South American countries on the income from the sales of the commodities which it bought in those countries and then sold.

Section 904 of the code provides the method in which the amount of foreign tax credit allowable is to be determined. Section 905(b) provides:

The credits provided in this subpart [§§ 901–905 of this title] shall be allowed only if the taxpayer establishes to the satisfaction of the Secretary or his delegate—

(1) the total amount of income derived from sources without the United States, determined as provided in part I [§§ 861–864 of this title],

(2) the amount of income derived from each country, the tax paid or accrued to which is claimed as a credit under this subpart [§§ 901–905 of this title, such amount to be determined under regulations prescribed by the Secretary or his delegate, and

(3) all other information necessary for the verification and computation of such credits.

Although Section 905(b)(2) of the Code provides that the source of income is to be determined under regulations promulgated by the Treasury Secretary no formal regulation exists which solves the problems presented by the instant case. Defendant contends that the prop-

---

2. In order to compute foreign tax credit, the Government gives the company two choices.

Anderson, Clayton chose § 904(a)(1) of the Code, the per-country limitation.

er treasury regulation to be considered is § 1.902–1(c) (1957).[3] This provision, in essence, determines the source of income as the place in which the foreign corporation receiving the income is incorporated.

Plaintiff relies upon the fact that the 1962 Revenue Act modified the foreign tax credit sections of the code. Regulation 1.902–5(a) (1965) governs here and provides that paragraphs (a) through (e) of Treas.Reg. 1.902–1 shall not apply, and that Treas.Regs. 1.902–3 and 1.902–4 shall apply to the years covered by the Revenue Act of 1962. From this plaintiff concludes (1) plaintiff's fiscal 1964 was covered by the Revenue Act of 1962, (2) under § 963 of the code, the minimum distribution was composed of a portion of Lausanne's earnings and profits from 1964, (3) pursuant to Treas.Reg. 1.902–5(a) (1965), Treas. Reg. 1.902–3 and 1.902–4 are applicable, and (4) Treas.Reg. 1.902–1(c) is inapplicable to the minimum distribution received in fiscal 1964.

It is undisputed that Treas.Reg. 1.-902–3 and 1.902–4 (1965) do not contain a provision comparable to the source of income provision of § 1.902–1(c) (1957) above, which holds that the country of incorporation is the source. Rather, 1.-902–3(d)(1) contains the reference "[Reserved]." The applicable treasury regulations under § 902 are silent on how the source is to be determined.

Although the government does not dispute that the treasury regulations under § 902 are silent on this question, the government contends that the plaintiff places undue emphasis on this fact. Proposed Treas.Reg. 1.902–3(d)(1) carries forward the idea of source as the place of incorporation. Apparently 1.-902–1(c) was repealed with a view to

the promulgation of new rules to govern the new situations created by the 1962 act adding Subpart F. However, nothing comparable to the regulation was later promulgated. The intention of the Treasury Department to continue using the rationale the Government relies upon, however, is expressed in T.D. 6805, 1965–1 Cum.Bull. 38 in which the Internal Revenue Service announced that the proposed regulation would be reissued. Yet, the regulation has never been reissued.

The plaintiff contends that there exist basic statutory rules elsewhere in the code for making the determinations of income sources and plaintiff's position is but an application of these. Anderson, Clayton proposes that in the absence of this repealed regulation the Internal Revenue Service go back to its general rule on determining source which is found in Treas.Reg. 1.861–7 implementing § 801 of the code:

(a) General. Gains, profits, and income derived from the purchase and sale of personal property shall be treated as derived entirely from the country in which the property is sold.

\*   \*   \*   \*   \*   \*

(c) Country in which sold. For the purposes of part I (Section 861 and following), subchapter N, chapter 1 of the Code, and the regulations thereunder, a sale of personal property is consummated at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer . . . .

The Government makes many legal and moral arguments for its position. The most compelling argument is one which attempts to show how Anderson, Clayton is trying to avoid the "tax-haven" provisions of Subpart F by claim-

---

3. This regulation provides:

1.902–1(c) Source of income of foreign subsidiaries and country to which tax is deemed to have been paid. For the purpose of section 904(a)(1) (relating to the per-country limitation), dividends of a foreign corporation (at least 10 percent of whose voting stock is owned by a do-

mestic corporation) shall be deemed to have been derived from sources within the foreign country or possession of the United States in which such foreign corporation is incorporated, to the extent that under section 862(a)(2) such dividends are treated as income from sources without the United States.

ing that the income was from Switzerland. Section 904(a) of the code establishes the limitations on a tax credit for foreign taxes. The taxpayer may elect either an "overall limitation" or a "per-country limitation." Anderson, Clayton elected a per-country limitation. This limitation restricts a taxpayer's foreign tax credit to a percentage of its United States taxes equal to the proportion which the taxpayer's taxable income from the particular country bears to his entire taxable income from all sources, as we have seen. If he reports more taxable income from sources within those countries which levy income taxes at a relatively high tax rate, the taxpayer stands to gain a greater foreign tax credit benefit, percentagewise. The Government alleges that Anderson, Clayton has attempted to do just this since Argentina, Brazil, and Peru have higher tax rates than Switzerland. The Government argues that this would defeat the congressional intent in passing Subpart F. Although later in its brief the Government points out that in actual recoverable tax dollars in this case it would not lose that much (a position apparently refuted by the plaintiff's reply brief, on pages 16 and 17), the Government's efforts are directed toward "avoiding a strained and illogical application of the foreign tax credit provisions of the Code and Regulations." Defendant's brief, p. 24.

The plaintiff does not really answer the question presented by the Government, but points out that the examples used create a false impression of the case as it exists here. The plaintiff's argument is that under United States v. Balinovski, 236 F.2d 289 (2d Cir. 1956), cert. denied, 325 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 and Treas.Reg. § 1.861–7, the source of income derived from the sale of personal property is the place where title to the property is passed. Since the parties have stipulated that the title to the property in question passed in Argentina, Brazil, and Peru, respectively, the plaintiff argues that it is the Government which is "converting"

Argentine, Peruvian, and Brazilian source income into Swiss source income, not Anderson, Clayton which is converting Swiss source income into South American income.

The plaintiff's and the Government's arguments on the logical and moral issues are intended to buttress the basic arguments of each, but do little more than cloud the issues. The basic decision to be made is whether or not to utilize the Government's rationale for source of income, which through inadvertence or design has never been officially reenacted in the regulations, or to utilize the plaintiff's resort to the general statute to determine the "source" of the income. The court believes that the Secretary of the Treasury should reenact its regulation if it is to be followed by a court. Accordingly, the court finds that plaintiff is entitled to judgment as a matter of law from the undisputed facts in this case that, for the purposes of computing the limitations upon plaintiff's allowable foreign tax credit, of the $4,684,233.96 minimum distribution to plaintiff by its Swiss subsidiary, Anderson, Clayton & Co., S.A. ("Lausanne"), in fiscal 1964: (a) $13,659.00 thereof was derived from sources within Argentina, (b) $3,223,290.00 thereof was derived from sources within Brazil, and (c) $15,517.49 thereof was derived from sources within Peru.

The second question left for the court's determination also involves the foreign tax credit limitation provided by the code. The plaintiff, during fiscal 1964 became entitled to receive dividends declared by its Argentine subsidiaries. However, at the time the dividends were to be distributed, the Argentine currency was blocked by orders of the Argentine government. Because the Argentine peso was blocked, plaintiff received the dividend distribution in the form of negotiable promissory notes payable to the order of plaintiff in Argentine pesos. Plaintiff then converted the principal amount of the notes into United States dollars at the rate of ex-

change prevailing at the date of distribution and included the notes in its gross income as a dividend in the amount of $1,150,320.87. In order to compute the limitations on its allowable foreign tax credit for fiscal 1964, the plaintiff reported the amount of the dividend in its gross income, as constituting income from sources within Argentina. At the end of fiscal 1964 plaintiff determined the United States dollar value of the promissory notes to be $871,428.59, by applying the then prevailing exchange rates and deducted the $278,892.29 diminution in value of the notes as an ordinary business loss. Because the notes were held by plaintiff within the United States at all times during fiscal 1964 after the date of their receipt, the plaintiff reported the amount of the loss as constituting a loss from sources within the United States for the purposes of computing the limitations upon the amount of its foreign tax credit for fiscal 1964. When the plaintiff's return was examined, however, the Government determined that if the plaintiff had actually realized any deductible loss as a result of the exchange rate decline, which it denies now, such a loss was an Argentine source loss which had to be treated as such in computing the foreign tax credit to which plaintiff was entitled as a result of tax levied by the Argentine government.

The Government's first allegation, then, is that the plaintiff did not realize a deductible loss of $278,892.29 during the fiscal year ending July 31, 1964, as a result of the decline in value of the promissory notes received as dividends from its Argentine subsidiary in fiscal 1964.

The plaintiff contends that the Government is barred from raising an issue as to the propriety of the claimed exchange loss because the Government failed to raise the issue by means of a counterclaim or defense by way of offset against any refund, to which the court may conclude the plaintiff is entitled.

The Government relies upon language in United States v. Pfeister, 205 F.2d 538, 542 (8th Cir. 1953):

The validity of any deduction claimed by the taxpayer in his income tax return is inevitably in issue in his action to recover alleged overpayments of income tax.

The Eighth Circuit goes on to repeat a quotation found in Lewis v. Reynolds, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932):

[T]he ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him. Lewis v. Reynolds, 48 F.2d 515, 516 (10th Cir. 1931).

The conclusion which the Eighth Circuit reached was that if the evidence raises a question of the legality or amount of a claimed deduction in an action to recover an overpayment of taxes, there is an issue raised for purposes of defense regardless of its availability as an affirmative remedy.

■ The court, agreeing with the Eighth Circuit, does not believe that there is any necessity for the Government to plead its contentions in a counterclaim or offset against a refund because the Government is not attempting to assert a separate liability in avoidance of the claim, but it only challenges the allegation that plaintiff has paid too much in taxes for fiscal 1964. Nor does the court agree with the plaintiff that the plaintiff has been deprived of an opportunity to fairly meet the defendant's

contentions. The court concludes the issue is properly before the court.

▮ The Government's first contention is that the plaintiff did not realize a deductible loss of $278,892.29 during the fiscal year ending July 31, 1964, as a result of the decline in value of the promissory notes received as dividends from its Argentine subsidiary because the plaintiff could not realize a deductible loss from the mere decline in value of the notes receivable which it had caused its Argentine subsidiaries to issue. The general and well established rule is that "a mere decline, diminution or shrinkage of the value of property does not constitute a deductible loss." 5 Mertens, Law of Federal Income Taxation (Rev.) § 28.14. The rule is applicable to all forms of property, from ships to building and loan shares. Mertens, *supra* at n. 61. Before a deductible loss can be claimed, the property must be sold, abandoned, or discarded, or there must be a demonstration of complete worthlessness.

▮ In the specific area of fluctuations in the value of foreign currency, the rule, for the most part, holds true, and "mere shrinkage in the value of foreign money is not enough to permit a deduction for a loss sustained." Mertens, *supra* at § 28.82. When losses are allowed, they are allowed only at the time foreign currency is converted into dollars. Mertens, *supra*.

In the instant case the peso notes had not been exchanged for United States dollars at the end of the fiscal year, so no deductible loss had been realized under the general rule.

Without arguing this point, Anderson, Clayton's reply to the Government's position is that the defendant is collaterally estopped from denying that plaintiff is entitled to claim the loss in fiscal 1964. In the 1930's the plaintiff maintained branch offices in Alexandria, Egypt, and Havre, France, among other places. The profits of these branches were figured by adjusting the current accounts on the books of the branch offices to the dollar values at the close of each fiscal year. The amounts in dollar value were then carried over to the home office account and were reported as income for United States tax purposes. The Internal Revenue Service challenged this accounting method for the years 1933 and 1934 and suit was brought in the United States tax court. The plaintiff and the Commissioner eventually settled the case and reached an agreement which allowed Anderson, Clayton to keep the accounts of its autonomous foreign offices in foreign currency and to determine the income of these branches by figuring the difference in dollar net worth at the beginning and the end of the year, adjusting for any profits transferred from the branch during the year. This accounting practice was challenged again in the Court of Claims for certain claims made in the years during World War II. The Court of Claims handed down its decision in the case in 1958. The Court of Claims held that the plaintiff was entitled to a loss deduction for exchange losses determined under its accounting practice with respect to all payables from foreign branches, subsidiaries, or unrelated entities for which the plaintiff had a tax basis. Anderson, Clayton & Co. v. United States, 144 Ct.Cl. 106, 168 F.Supp. 452 (1958).

The plaintiff's position is that there is an identity of issues in that case and the instant case, and that the controlling facts and applicable legal rules have not changed since 1958.[4] The plaintiff points out that the parties to the 1958 Court of Claims case are identical to those now before the court and the matter at issue before the Court of Claims

---

4. Plaintiff cites Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) in which the Supreme Court stated the requirements for collateral estoppel in tax controversies involving different tax years:

(1) identity of issues and (2) the absence of change in controlling facts and applicable legal rules. 333 U.S. at 599–600, 68 S.Ct. 715.

in the 1958 case was the propriety of the deduction of an exchange loss upon receivables from plaintiff's Egyptian subsidiary, which was held by the plaintiff. The issue the defendant raises in the instant case involves the propriety of the deduction of an exchange loss upon receivables of plaintiff's Argentine subsidiaries which were held by plaintiff. Plaintiff further points out that the controlling facts involve plaintiff's long established accounting practice concerning exchange fluctuations upon its receivables from and payables to foreign subsidiaries as well as foreign branches and unrelated entities which have not varied in substance since 1930 and which have been accepted and approved by the Government, except with respect to items in which the plaintiff had no tax basis, at least since 1958.[5] Pursuant to Anderson, Clayton & Co. v. United States, *supra*, the plaintiff realized and properly claimed a deduction for fiscal 1964 for the $278,893.29 exchange loss sustained in fiscal 1964, as the plaintiff views the case. In other words, the plaintiff concludes that the defendant is collaterally estopped from denying that the plaintiff realized the exchange loss in fiscal 1964 because of the decline in United States dollar value of the Argentine peso between the date of the distribution and the end of fiscal 1964.

The Government contends that because the controlling facts in the older cases and the instant case are not the same, collateral estoppel cannot apply. The Government's theory is that prior litigation between the parties was concerned with balancing reciprocal accounts between plaintiff and its foreign branch offices through which accounts the plaintiff's own net operating income was determined. It argues that the settlement agreement referred only to foreign branch offices of the parent corporation and not to foreign subsidiaries which are themselves corporations. Further, in the instant case, the concern is with the fluctuation in the values of current assets which consisted of negotiable notes plaintiff received from his foreign subsidiaries. The Government points out that the plaintiffs caused the Argentine subsidiaries to declare the dividends and also caused the subsidiaries to issue negotiable notes in the payment of those dividends, even though the cash payment was prohibited under laws of Argentina. The plaintiff's voluntary action caused it to receive income, and nothing in Subpart F of the code required plaintiff to force the Argentine subsidiaries to declare dividends, or to issue notes in payment of the dividends. In fact, Subsection 964(b) of the Internal Revenue Code of 1954 and regulations promulgated thereunder provide for situations in which currency or other restrictions or limitations imposed by foreign countries prevent the distribution by the controlled foreign corporation to the United States stockholder for earnings and profits of that controlled foreign corporation, by in essence exempting corporations faced with this situation from the Subpart F provisions.

The Government reasons that the agreement between the parties which terminated the tax court litigation of the 1930's should be restricted to its intended application, *i. e.*, that of determining the correct income earned by plaintiff through its own foreign branch offices. This application should not be expanded to encompass declines in value of dividends issued in the form of negotiable securities which plaintiff received from separate foreign corporate entities. To conclude, the defendant submits that the plaintiff realized no deductible loss, in fiscal 1964, as the result of a decline in value of the negotiable securities and that the realization of a loss must wait for plaintiff's disposition of the notes.

---

5. The parties have stipulated:
   Plaintiff has consistently maintained an accounting practice of reflecting at the end of each fiscal year gains and losses from exchange fluctuations on payables to and receivables from its foreign subsidiaries and unrelated concerns as well as from its foreign branches.
   Third Stipulation, 10.

Plaintiff, of course, does not agree that the facts are dissimilar. In the first place, the language of the 1942 agreement entered into between plaintiff and defendant, while not explicitly including foreign subsidiaries, uses the term "other autonomous foreign offices," and the plaintiff asserts this term is easily susceptible of an interpretation including corporate foreign subsidiaries. In 1958 the Court of Claims reviewed the agreement between plaintiff and defendant and the practices of the plaintiff pursuant to that agreement and used the agreement in relation to an Egyptian subsidiary of plaintiff. In the second place the plaintiff points out that in the specific findings of fact and conclusions of law handed down by the Court of Claims in the 1958 case, referring to the settlement agreement the Court of Claims stated that "pursuant to the above agreement, plaintiff thereafter consistently reflected gains and losses from its exchange fluctuations on accounts payable to or receivable from its foreign subsidiaries and unrelated concerns as well as from its foreign branches." 168 F.Supp. at 543. In the third place, the foreign entities involved in the exchange loss issues before the Court of Claims were not only plaintiff's Alexandria branch office but Niles Ginning Company which was an Egyptian subsidiary of plaintiff. The exchange losses at issue in the case were sustained with respect to accounts of both of those entities. The issue before the Court of Claims was the propriety of an allowance of a deduction for the resulting exchange losses sustained by plaintiff under its accounting methods with respect to the subsidiary's obligations to the parent.

Plaintiff argues that the Court of Claims recognized the propriety of the plaintiff's method of accounting and the allowance of the exchange loss deduction and inclusion of exchange gain income realized thereby. The court held, however, that the defendant could only claim a loss deduction with respect to the Egyptian subsidiary's account to the extent that the plaintiff had a tax basis therein. Accordingly, they partially disallowed plaintiff's loss deduction to the extent that it exceeded plaintiff's basis in the subsidiary's account. The factual account of the way in which the Egyptian case arose is as follows.

In 1939 after World War II broke out, the Egyptian government clamped controls on the transfer of Egyptian pounds into United States dollars. This prohibited the plaintiff from remitting any profits it might receive at its Egyptian branch to its home office. At the end of the war, fiscal year July 31, 1945, the plaintiff, after Egyptian taxes, had net remitted earnings of 128,119,471 Egyptian pounds. All of this income had been reported as United States income at the rate of $4.13 to the pound. On July 31, 1945, and after, until the branch office was liquidated, the plaintiff took into its United States income for United States tax purposes the dollar value of its branch office profits. On January 31, 1949, the Alexandria branch office was liquidated and the Nile Ginning Company took over all of the branch's assets and liabilities. On its books in Houston the plaintiff had a current account receivable of £250,665.745, Egyptian, which represented blocked funds valued at the then rate of $4.13 to the pound. In September of 1949 Britain devalued the pound sterling and this resulted in a reduction of the Egyptian pound. On July 31, 1950, the Egyptian pound was worth only $2.50. The resulting decrease in the plaintiff's blocked Egyptian earnings amounted to $413,462.19 and the plaintiff claimed a loss deduction on its fiscal 1950 income tax return for this amount. The Commissioner denied this claim on the grounds that the Egyptian account represented Egyptian income deferred under Mimeograph 6475. This Mimeograph from the Internal Revenue Service attempted to deal with the problem of income in currency or other property situated in foreign countries having monetary or exchange restrictions. These restrictions made it difficult for

the taxpayer to ascertain the value in terms of United States dollars of the blocked income arising in countries having such restrictions. The plaintiff had utilized this Mimeograph but it claimed that under the collateral agreement entered into during the 1930's it should be allowed to include the exchange fluctuations of its Egyptian account in determining its 1950 taxable income, notwithstanding the Mimeograph. The Court of Claims found that:

> as set out in the collateral agreement it would be entitled to include in a loss deduction the deminution of the dollar value of the Egyptian pound account in the year 1950. However, when plaintiff elected to come under the terms of the Mimeograph which permitted the deferral of blocked income, it, to that extent, abandoned its former method of accounting and is now bound by the terms of the Mimeograph.

To the extent that the plaintiff's Egyptian account represented earnings for the years 1946–1949, those sums had never been reported as income and would not be reported as income until they became unblocked. No deduction was allowed for the years 1946–1949, but pre-1946 the plaintiff was entitled to deduct the sum representing the loss claimed on the tax paid to the United States on the Egyptian accounts and was entitled to a sum representing the overpayment.

The 1934 agreement between the plaintiff and the Commissioner, which is set out in Finding of Fact Number 4 in the 1958 Court of Claims case, Anderson, Clayton v. United States, *supra*, is concerned with the question of foreign branch accounting. The branches and subsidiaries kept their accounts in foreign currency. Their income, it was agreed, was to be determined by the difference in dollar net worth at the beginning and end of the year adjusted for any profits transferred from the branch during the year. In order to calculate the dollar net worth the current dollar rate of the foreign currency involved was used in the case of all current assets and all liabilities and the dollar value of fixed assets was to be determined by the original foreign currency cost converted to dollars at the rates in effect at the date the investment was made. Transfers of funds inter-office were to be included at the rates actually used. The idea was to take into income the fluctuations in net worth resulting from changes in dollar values of liabilities and current assets carried in foreign currencies and the intention was to avoid inclusion in income of changes in the dollar value of fixed assets and investments as a result of fluctuation of exchange rates unless and until the assets were sold or disposed of. Clearly, therefore, the agreement concerned a method of calculating the income of the taxpayer Anderson, Clayton. While the law has not changed with specific regard to the issue and it is stipulated that the method of figuring income is essentially unchanged, the government points out that the agreement should be restricted to its intended application. It characterizes this intended application as "determining the correct income earned by the plaintiff through its own foreign branch offices."

There are differences between the instant transaction and the one litigated in 1958. Starting in 1939 the plaintiff was unable to actually receive the income from its subsidiary because the funds were blocked by the Egyptian government. The plaintiff reported those earnings according to the agreement, however. The earnings went down on the books in the United States as United States earnings. Since the Egyptian subsidiary calculated its books on the Egyptian pound note basis, the United States company had to put the income down as dollars, and converted the pounds into dollars at the rate of $4.13. In the years 1939 to 1949 the United States company received only one actual remittance from Egypt, but it had paid United States taxes on the money as if it had earned these dollars at that exchange rate. This practice continued

until Anderson, Clayton began to employ Mimeograph 5475. The Mimeograph was considered by the Court of Claims as an exception to the rule of waiver of the agreement, as we have seen; so the Court of Claims only allowed Anderson, Clayton a recovery for exchange losses for Egyptian pounds earned prior to August 1, 1945, on which the plaintiff had paid United States income tax. In the instant case the subsidiaries in Argentina declared a dividend (the government suggests that the parent corporation unnecessarily caused the subsidiaries to declare these dividends) which the subsidiaries could not pay in cash because of currency blockage. Rather, the subsidiaries issued negotiable promissory notes which then depreciated in value from date of receipt to the close of the fiscal year.

It is the court's duty to ascertain whether or not the agreement of the 1930's covers the instant case. The facts are similar in that the Argentine corporation issued security notes representing income to the parent corporation. The settlement agreement provided that Anderson, Clayton could figure its income so that the income of its subsidiaries was carried as income of the United States company and the fluctuations in value by reason of the exchange rate were figured twice a year and any gains and losses were accounted for when the taxes were paid on the income.

■ The court believes that the agreement of the 1930's should be restricted to its intended use. In the instant case, the transaction was really not an adjustment of operating income between parent and foreign holdings (as was intended by the original agreement), but a dividend issued by the subsidiary to the parent for its own reasons. To the extent that the Court of Claims allowed in 1958 a loss deduction for the currency fluctuations of the Egyptian pound, this court believes that the Court of Claims was attempting to rectify an unfortunate result of war and was not intending to set a precedent for future litigation. Accordingly, the court finds that, applying the general rule, the plaintiff did not realize a loss of $278,892.29 during the fiscal year ended July 31, 1964, as a result of the decline in value of promissory notes which plaintiff received in fiscal 1964 as dividends from its Argentine subsidiaries.

It has been stipulated [Third Stipulation, 18] that the plaintiff need not present further evidence of the dollar amount of any judgment to which it may be entitled by virtue of a decision of the court favorable in full or in part to plaintiff. Such amount, if any, will be computed by defendant in accordance with its normal procedures, and the right is reserved to plaintiff to have the court recompute such amount in the event plaintiff should not be satisfied with defendant's computation.

Accordingly, the Government is directed to recompute the plaintiff's tax in accordance with this court's findings and to submit a proposed judgment to the court within ninety (90) days from the date of the entry of this order.